Argued and submitted September 8, 1999, decision of Court of Appeals affirmed in part and reversed in part; judgment of circuit court affirmed in part and reversed in part and case remanded to circuit court with instructions January 11, 2001

Mark PARROTT,
*Petitioner on Review,*

*and*

Charles FORSHEY,
*Plaintiff,*

*v.*

CARR CHEVROLET, INC.,
an Oregon corporation,
*Respondent on Review.*

(CC C93-0873CV; CA A88512; SC S45916)

Mark PARROTT,
*Respondent on Review,*

*and*

Charles FORSHEY,
*Plaintiff,*

*v.*

CARR CHEVROLET, INC.,
an Oregon corporation,
*Petitioner on Review.*

(SC S45917)
(Cases Consolidated for Argument and Decision

17 P3d 473

Kathryn H. Clarke, Portland, argued the cause for petitioner-cross-respondent on review Parrott. With her on the briefs were Maureen Leonard and Michael C. Baxter, Portland.

Barbee B. Lyon, of Tonkon Torp LLP, Portland, argued the cause and filed the briefs for respondent-cross-petitioner on review Carr Chevrolet, Inc.

Megan A. Flynn and Kevin Keaney, Portland, and James S. Coon, of Swanson, Thomas & Coon, Portland, filed briefs on behalf of *amicus curiae* Oregon Trial Lawyers Association.

Craig A. Nichols, of Nichols & Associates, Portland, filed a brief on behalf of *amicus curiae* Oregon Automobile Dealers Association.

Before Carson, Chief Justice, and Durham, Kulongoski, and Leeson, Justices.**

KULONGOSKI, J.

---

** Gillette, Riggs, and De Muniz JJ., did not participate in the consideration or decision of this case. Van Hoomissen, J., retired December 31, 2000, and did not participate in the consideration or decision of this case.

## KULONGOSKI, J.

Parrott (plaintiff)[1] brought this civil action against Carr Chevrolet, Inc. (defendant), arising from defendant's sale of a used 1983 Chevrolet Suburban to plaintiff. Plaintiff alleged, *inter alia*, that defendant had violated certain provisions of the Unlawful Trade Practices Act (UTPA), ORS 646.608(1)(e), (g), and (t).[2] The jury returned a verdict in plaintiff's favor and awarded $11,496 in compensatory damages and $1 million in punitive damages. After the verdict, defendant filed motions for a judgment notwithstanding the verdict (JNOV) under Oregon Rule of Civil Procedure (ORCP) 63 or, in the alternative, for a new trial under ORCP 63 C and ORCP 64. One of the grounds that defendant asserted in support of its motion for a new trial was that the jury's punitive damages award was excessive. Although the trial court denied defendant's JNOV and new-trial motions, it ruled that the punitive damages award was excessive and reduced it to $50,000. The trial court then entered judgment for plaintiff in the amount of $11,496 in actual damages and $50,000 in punitive damages. The trial court also rejected plaintiff's attorney fees request for $55,468.75, awarding, instead, fees of $15,000. Both plaintiff and defendant appealed.

---

[1] After plaintiffs Parrott and Forshey presented their case-in-chief, the trial court directed a verdict in defendant's favor on all claims that plaintiff Forshey had asserted. Forshey is not a party to the appeal or review.

[2] ORS 646.608(1) provides, in part:

"A person engages in an unlawful practice when in the course of the person's business, vocation or occupation the person does any of the following:

"* * * * *

"(e) Represents that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that they do not have * * *.

"* * * * *

"(g) Represents that real estate, goods or services are of a particular standard, quality, or grade, or that real estate or goods are of a particular style or model, if they are of another.

"* * * * *

"(t) Concurrent with tender or delivery of any real estate, goods or services fails to disclose any known material defect or material nonconformity."

■ On appeal, plaintiff assigned error to the trial court's reduction of the punitive damages award from $1 million to $50,000 and to the trial court's rejection of plaintiff's attorney fees request. Defendant cross-appealed, contending, generally, that plaintiff had failed to state a claim under the UTPA, that the trial court had erred in awarding *any* punitive damages, and that the trial court's $50,000 punitive damages award was excessive. The Court of Appeals affirmed on defendant's cross-appeal. On plaintiff's appeal, it reversed the trial court's reduction of the jury's punitive damages award and remanded with instructions to enter judgment allowing defendant's motion for new trial unless plaintiff filed a remittitur of punitive damages in the amount of $300,000. *Parrott v. Carr Chevrolet, Inc.*, 156 Or App 257, 965 P2d 440 (1998).[3] Both parties petitioned for review, challenging the Court of Appeals' analysis in its review of the punitive damages award and whether the punitive damages award was unconstitutionally excessive.[4] We allowed both petitions.

The primary issue on review is the appropriate standard for post-verdict judicial review of a punitive damages award in Oregon in light of *BMW of North America, Inc. v. Gore*, 517 US 559, 116 S Ct 1589, 134 L Ed 2d 809 (1996). For the reasons that follow, we hold that the rational juror inquiry in *Oberg v. Honda Motor Co.*, 320 Or 544, 888 P2d 8, *cert den* 517 US 1219 (1996) (*Oberg* (state)),[5] remains the

---

[3] The Court of Appeals also reversed the trial court's award of attorney fees and held that the trial court had abused its discretion when it awarded plaintiff's counsel $15,000, rather than the $55,468.75 that counsel had requested. *Parrott*, 156 Or App at 282. In its brief on the merits, defendant asks this court to reverse the Court of Appeals on that issue and to "restore the trial court's award of attorney fees." Defendant, however, did not raise that issue in its petition for review. Because of that omission, we decline to consider the issue and express no opinion on its merits. *See* ORAP 9.17(2)(b)(i) (brief on merits may not raise additional questions or change substance of questions already presented in petition for review); ORAP 9.20(2) (Supreme Court *may* review issue raised in Court of Appeals but not presented on review). *See, e.g., Stupek v. Wyle Laboratories Corp.*, 327 Or 433, 437, 963 P2d 678 (1998) ("Although, under ORAP 9.20(2), this court may review an issue that properly was raised on appeal and preserved, but not presented on review, we ordinarily will not do so unless the issue requires resolution.").

[4] Defendant raised only one additional issue in its petition for review: Whether, in light of ORS 72.3160(3)(a) (allowing "as is" sales), plaintiff failed to state a claim under the UTPA.

[5] The *Oberg v. Honda Motor Co.* case resulted in two opinions from this court and one from the United States Supreme Court. For purposes of our discussion,

standard of post-verdict judicial review of punitive damages in Oregon for excessiveness under the federal constitution and that *Gore*'s set of nonexclusive guideposts are factors that the reviewing court should consider as part of the *Oberg* (state) review. Applying the *Oberg* (state) standard and the *Gore* guideposts to the record before the jury in this proceeding, we hold that the jury's $1 million award of punitive damages is within the range that a rational juror would be entitled to award.

■ The following facts are taken from the record. We view the evidence, and the reasonable inferences to be drawn therefrom, in the light most favorable to plaintiff, the party in whose favor the jury returned the verdict. *Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or 487, 490, 982 P2d 1117 (1999).

Defendant operated a budget lot for used vehicles advertised as "quality checked used cars." The vehicles on that lot were sold "as is" and had been driven at least 100,000 miles. In December 1992, defendant acquired a 1983 Suburban as a trade-in from Myers. Defendant sent the Suburban to the budget lot, priced at $5,995. Two weeks after defendant had acquired the Suburban, plaintiff went to defendant's budget lot in search of a three-quarter ton truck. A salesperson directed him to the Suburban. After examining the Suburban, plaintiff noticed that someone had polished, cleaned and serviced it, and that the radiator, batteries, tires, and upholstery looked new. The engine was painted blue, and plaintiff assumed that it had been replaced. He commented: "It looks like quite a lot of recent work was done on this vehicle," to which the salesperson replied, "[y]eah." Plaintiff also noticed that the Suburban's air cleaner was missing, but the salesperson assured him that defendant would replace it.

The following week, plaintiff purchased the Suburban. After trading in his two vehicles as a down payment toward the purchase price of the Suburban, plaintiff signed a

only two of those decisions are relevant: the Supreme Court's opinion in *Honda Motor Co. v. Oberg*, 512 US 415, 114 S Ct 2331, 129 L Ed 2d 336 (1994), which we refer to as *Oberg* (federal); and the final opinion issued by this court, *Oberg v. Honda Motor Co.*, 320 Or 544, 888 P2d 8, *cert den* 517 US 1219 (1996), which we refer to as *Oberg* (state).

credit agreement through defendant for the balance of the Suburban's purchase price, $2,892.17. Plaintiff also signed the sales documents to complete the transaction, which included a "Special Disclaimers and Conditions" form and a "Buyer's Order."

Included in the Special Disclaimers and Conditions form was a section stating that the dealership visually had inspected the vehicle and that there were no apparent deficiencies in the installation of emission control devices. When plaintiff pointed out that that statement was inconsistent with the missing air cleaner, defendant gave him a "we owe" statement for that missing piece of equipment. The Buyer's Order, in contrast, included a typewritten section stating that the dealership had not inspected the vehicle and had no knowledge of the vehicle's condition, the accuracy of the odometer, or Department of Environmental Quality (DEQ) certification. After he had completed all the paperwork, plaintiff drove the Suburban home.

Shortly thereafter, plaintiff discovered multiple problems with the Suburban, including several missing pieces of emission control equipment, not only the air cleaner.[6] Through his own investigation, plaintiff also discovered that it was impossible to bring the Suburban into DEQ compliance because of the missing equipment and a difference in age between the Suburban and its engine. Plaintiff noticed that the Vehicle Identification Number (VIN) located on the door, which should have matched with the VIN in the glove box, had been removed. He also noticed that there were white lines between the numbers on the odometer. Plaintiff conducted his own title search and learned through the Department of Transportation, Driver and Motor Vehicle Services (DMV), that the Suburban previously had been damaged in California and that it had a "title brand," which meant that the Suburban's title had a notation indicating that it had been damaged severely, totaled, or stolen. Once plaintiff's insurer learned about the branded title, it no

---

[6] One of plaintiff's expert witnesses testified that the emission control equipment missing from the Suburban included an air cleaner, an exhaust gas recirculation system, and an air pump.

longer would provide comprehensive insurance for the Suburban.

When plaintiff complained to defendant, defendant's employees told plaintiff that repair was his problem because he had purchased the Suburban "as is." They also told him that the Suburban's engine did not require DEQ equipment and that, regardless of that fact, he should not worry about DEQ compliance, because the registration was valid for another two years. At one point, a salesperson told plaintiff that defendant would replace the engine, but with junkyard parts. Ultimately, negotiations between plaintiff and defendant for a replacement vehicle failed when one of defendant's salespeople yelled at plaintiff, telling him that the Suburban was "unfixable" and that he would have to "learn to live with it" unless he agreed to a refund of $3,100—an amount equivalent to his down payment but that did not include reimbursement for the value of his trade-ins or his loan and insurance fees. Negotiations between plaintiff and defendant's attorney for rescission of the transaction also failed.

As a result, plaintiff filed this action against defendant, alleging, among other things, that defendant had violated the UTPA by willfully selling the Suburban:

"1)   Falsely claiming it was equipped with proper emission controls;

"2)   Falsely representing it had been driven 100,608 miles;

"3)   With defaced or missing VIN numbers in violation of Oregon law;

"4)   Without disclosing that the emission control equipment had been removed; and

"5)   Selling the vehicle without disclosing it had previous out of state damage."

At trial, plaintiff proved that defendant had known about the condition of the Suburban when defendant sold it to plaintiff. When defendant had acquired the Suburban as a trade-in from Myers, Myers had provided defendant with a temporary registration form as proof of ownership. It was clear from examining Myers's temporary registration form

that someone had altered it in an attempt to conceal that it had expired. Plaintiff's experts testified that no used car dealership would accept the expired document as proof of ownership without confirmation from DMV. The Monday after Myers had brought the Suburban to defendant, someone had requested and received a Basic Vehicle Information sheet from a DMV field office. That document confirmed that Myers was the registered owner of the Suburban, that the Suburban had an odometer discrepancy, and that the Suburban had received "out-of-state damage — CA."

Preble, co-owner and chairman of the board of Carr Chevrolet, acknowledged at trial that, as proof of ownership, Myers's temporary registration form was a "flimsy document" and that, consequently, defendant had asked Myers to sign a "Secure Power of Attorney." A Secure Power of Attorney is a DMV form that dealers use when the owner of a vehicle has lost a title or the title is in the possession of a security interest holder. The form authorized defendant to transfer title from Myers to the new owner, in this case, plaintiff. One purpose of the form is to protect customers, like plaintiff, from an odometer discrepancy. Although Myers had filled out Part A of the Secure Power of Attorney, defendant never completed Parts B and C. Had defendant completed the Secure Power of Attorney when it sold the Suburban to plaintiff, plaintiff would have learned about the odometer discrepancy before completing the transaction.

In addition to the Secure Power of Attorney, Myers also had filled out, albeit incompletely, a "Secure Odometer Disclosure/Reassignment" form for his trade-in vehicles. Plaintiff's expert testified that the only reason that a dealership would fill out both a Secure Power of Attorney and an incomplete Secure Odometer Disclosure/Reassignment form for the same vehicle was so that it could "try to sell [the vehicle] at a later date without proper disclosure of the mileage." Plaintiff's evidence demonstrated that the incorrect use of title transfer forms was a regular part of defendant's business practice. For its part, defendant acknowledged that it routinely asked customers to sign blank, undated, or otherwise incomplete title transfer forms, but it denied that it used incorrect, extra, or incomplete forms for any wrongful purpose.

When plaintiff purchased the Suburban, defendant had represented to plaintiff that it had possession of the Suburban's title, when, in fact, it had only Myers's expired temporary registration. Defendant subsequently obtained the replacement title that stated that the odometer reading "exceed[ed] mechanical limits" and that the car had received "previous damage — California." However, defendant did not disclose that information to plaintiff. When completing the documents to transfer title from Myers to plaintiff, defendant's title clerk had failed to notice that the mileage indicated on the front of the title, 107,497 miles as of July 1992, was greater than defendant's odometer reading when it acquired the Suburban from Myers, 100,608 miles as of December 1992. She testified that defendant had not trained her to check for such a discrepancy and that she never had done so. Referring to the discrepancy between the odometer statements on the front and back of the replacement title, Preble testified: "We would have been as alarmed as you were, had we paid attention to that fact." Claiming ignorance of DMV vehicle transfer requirements, Preble declined to identify anyone in the company with sufficient knowledge and authority to be responsible for what had happened, stating: "Our management style doesn't cause us to have final authority [for that] type of thing. That's not the style of management we have."

Defendant claimed that it had no knowledge of the Suburban's physical and mechanical defects before selling the Suburban to plaintiff and was equivocal about whether it had inspected the Suburban when it accepted it in trade. Defendant ultimately conceded, however, that, to accept the Suburban in trade, defendant had appraised it and performed a "minimal" inspection as part of that appraisal. Defendant's used car manager testified that a "minimal" inspection included a visual inspection of the physical condition of the Suburban, including the body, paint, glass, upholstery, and carpet, a check of specific equipment on the Suburban, such as the transmission and brakes, and a test drive of the Suburban "to make sure that the engine runs [and that] the transmission shifts."

Plaintiff's experts testified that, even without a detailed inspection of the Suburban, any minimally trained

dealership employee would have recognized the following "red flags" indicating that someone had "altered" the Suburban: (1) the driver's door was misaligned and was a different color; (2) the VIN was missing from the door and from the transmission; (3) several pieces of the emission control equipment were missing; (4) the engine was not the original engine that had come with the Suburban; and (5) "very visible" white lines were present between the odometer numbers—a clear indication that someone had tampered with the odometer and, therefore, that the mileage indicated likely was inaccurate. One of plaintiff's experts opined that there was "no question" that defendant knew that the mileage on the Suburban was not accurate, that the VIN had been removed, and that the Suburban was missing its emission control equipment and could not pass DEQ inspection.

As noted, the jury found for plaintiff on his UTPA claim, awarding him compensatory and punitive damages. Defendant challenged the jury's award of punitive damages on several grounds, including excessiveness under the Fourteenth Amendment to the United States Constitution.[7] The trial court noted that the record supported what was "an extraordinarily egregious violation" of the UTPA, but, on defendant's motion for elimination or reduction of the punitive damages award, lowered plaintiff's punitive damages award to $50,000, finding that $50,000 "is the number which is the top of the range which * * * a rational factfinder could award on this * * * record."

On appeal, the Court of Appeals followed *Blume v. Fred Meyer, Inc.*, 155 Or App 102, 963 P2d 700 (1998), which held that, after *Gore*, the *Oberg* (state) rational juror standard for post-verdict judicial review of punitive damages for excessiveness under the federal constitution no longer is applicable. *Parrott*, 156 Or App at 274-75. Both defendant and plaintiff petitioned for review, seeking clarification of the appropriate standard for post-verdict judicial review of a

---

[7] The Fourteenth Amendment to the United States Constitution provides, in part:

"No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law[.]"

punitive damages award in Oregon in light of *Gore*. We allowed review to consider that issue.

■ Before we reach that issue, however, we turn to the additional issue raised in defendant's petition for review, which is whether, in light of ORS 72.3160(3)(a), which permits "as is" sales, plaintiff failed to state a claim under ORS 646.608(1)(t).[8] We have considered and, for the reasons explained by the Court of Appeals, *Parrott*, 156 Or App at 270-71, reject without additional discussion defendant's arguments relating to that issue.

■ We turn, then, to the primary issue on review: What is the appropriate standard of post-verdict judicial review of a punitive damages award in Oregon following *Gore*? In *Honda Motor Co. v. Oberg*, 512 US 415, 114 S Ct 2331, 129 L Ed 2d 336 (1994) (*Oberg* (federal)), the United States Supreme Court held that the Due Process Clause requires the availability of post-verdict judicial review of punitive damages awards. In that opinion, however, the Court did not "address the more difficult question of what standard of review is constitutionally required." *Id.* at 432 n 10. On remand, this court held:

> "[T]he standard for post-verdict judicial review of an award of punitive damages is as follows: A jury's award of punitive damages shall not be disturbed when it is within the range that a rational juror would be entitled to award in the light of the record as a whole; the range that a rational juror would be entitled to award depends, in turn, on the statutory and common law factors that allow an award of punitive damages for the specific kind of claim at issue."

*Oberg* (state), 320 Or at 549 (footnote omitted).

Approximately one year after this court's decision in *Oberg* (state), the United States Supreme Court in *Gore*

---

[8] In its petition for review, defendant presented the court with three issues, two of which concerned review of punitive damages awards for excessiveness under the Fourteenth Amendment, and one of which concerned reconciliation of ORS 72.3160(3)(a) and ORS 646.608(1)(t). In its brief on the merits, however, defendant presented several additional issues, one of which concerned the sufficiency of the evidence to support the jury's findings that defendant violated the UTPA. We did not allow review of defendant's petition on that issue. Therefore, we decline to consider it and express no opinion on its merits. ORAP 9.17(2)(b)(i); ORAP 9.20(2). *See* 331 Or 541 n 3.

decided to address the question it previously had left unanswered in *Oberg* (federal) and "illuminate the character of the standard that will identify unconstitutionally excessive awards of punitive damages[.]" 517 US at 568 (internal quotation marks omitted). The plaintiff in *Gore* filed an action against BMW for fraud after he discovered that BMW had failed to disclose that his new automobile had been repainted due to damage during delivery. The jury awarded the plaintiff $4,000 in compensatory damages and $4 million in punitive damages. The trial court denied BMW's post-trial motion to set aside the punitive damages award, holding, among other things, that the award was not excessive. On appeal, the Alabama Supreme Court applied its state law criteria for judicial review (previously endorsed by the Supreme Court in *Pacific Mutual Life Insurance Co. v. Haslip*, 449 US 1, 21-22, 111 S Ct 1032, 113 L Ed 2d 1 (1991)), and concluded that the jury's punitive damages award did not exceed the constitutionally permissible amount. The Alabama Supreme Court, however, reduced that award to $2 million, because it found that the jury improperly had computed the amount of punitive damages by multiplying the plaintiff's compensatory damages by the number of similar sales in jurisdictions other than Alabama.

The United States Supreme Court reversed. *Gore*, 517 US at 586. Although the Court acknowledged the legitimacy of a state's interests in "punishing unlawful conduct and deterring its repetition" through punitive damages awards, it emphasized that the Due Process Clause prohibits states from imposing "grossly excessive" punishment on a tortfeasor. *Id.* at 568 (*citing TXO Production Corp. v. Alliance Resources Corp.*, 509 US 443, 456, 113 S Ct 2711, 125 L Ed 2d 366 (1993)). The Court explained that an award that the Court can characterize as "grossly excessive" in relation to the state's interests is one that is arbitrary and, therefore, violates due process. *Id.* Accordingly, review of a punitive damages award for excessiveness begins with identification of the state interests that a punitive damages award is designed to serve. *Id.*

The Court also held that "a person [must] receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may

impose." *Id.* at 574. The Court identified three "guideposts" to consider when evaluating whether a defendant has received fair notice of the magnitude of the punitive damages award that might be imposed: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the punitive damages award and the actual or potential harm inflicted; and (3) the civil and criminal sanctions provided for comparable misconduct. *Id.* at 574-85. The Court then analyzed the facts of *Gore* in light of those guideposts and concluded that the punitive damages award in that case was "grossly excessive," in violation of the Due Process Clause.[9] It then remanded the case to the Alabama Supreme Court. *Id.* at 586.

In this proceeding, defendant argues that the *Oberg* (state) rational juror standard of post-verdict judicial review "has been effectively overruled" by *Gore* and that the *Gore* guideposts alone should guide post-verdict review of punitive damages awards in Oregon. Defendant contends that, under the *Gore* guideposts, the jury's $1 million punitive damages award and the Court of Appeals' $300,000 punitive damages award both are "grossly excessive" in violation of the Fourteenth Amendment.

In response, plaintiff disputes whether *Gore* superseded *Oberg* (state). According to plaintiff, *Oberg* (state) announced a "state law review process" that the court must apply before applying *Gore*'s substantive due process review under the federal constitution. Citing *Oberg* (state), 320 Or at 549, plaintiff argues that, by focusing solely on the *Gore*

---

[9] The Court has indicated that the Due Process Clause imposes both procedural and substantive limits on punitive damages awards. Procedural due process requires "adequate guidance from the court" in the form of procedural safeguards to ensure that juries do not impose punitive damages in an arbitrary manner. *See Oberg* (federal), 512 US at 432 (post-verdict judicial review of punitive damages awards required as procedural safeguard under Due Process Clause); *Haslip*, 499 US at 23 (endorsing Alabama's procedural protections, including adequate jury instructions and post-trial procedures for scrutinizing punitive damages awards).

Substantive due process, by contrast, requires a jury's punitive damages award to be "reasonable in [its] amount and rational in light of [its] purpose to punish what has occurred and to deter its repetition." *Haslip*, 499 US at 21; *see also Gore*, 517 US at 562 (Due Process Clause prohibits imposition of "grossly excessive" punishment on tortfeasors); *TXO*, 509 US at 453-54 (Due Process Clause "imposes substantive limits beyond which penalties may not go" (internal quotation marks omitted)).

guideposts, defendant has "abandoned its state law prong of
its challenge" and conceded that the jury's verdict was
rational "in light of the record as a whole," based on "the stat-
utory and common law factors" governing the proceeding.
Plaintiff also argues that, under the *Gore* guideposts, the evi-
dence before the jury in this proceeding "fully supports" the
reasonableness of the jury's $1 million punitive damages
award and, therefore, that award does not violate the Four-
teenth Amendment.

Although defendant's challenge to the jury's puni-
tive damages award arises under the federal constitution, we
begin by addressing plaintiff's characterization of the *Oberg*
(state) rational juror standard as a "state law standard." *See
State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (court
must resolve all questions of state law before reaching fed-
eral constitutional arguments). As mentioned above, the
court in *Oberg* (state) responded to the Supreme Court's hold-
ing that the Due Process Clause of the Fourteenth Amend-
ment requires post-verdict review for excessiveness. There is,
however, no "state law excessiveness challenge" under the
Oregon Constitution.[10] *See* Or Const, Art VII (Amended), § 3
(prohibiting any "fact tried by a jury" from being "re-exam-
ined in any court of this state," unless no evidence supports
the verdict);[11] *Van Lom v. Schneiderman*, 187 Or 89, 110-13,
210 P2d 461 (1949) (assessment of punitive damages is ques-
tion of fact committed to decision of jury), *overruled in part on
other grounds by Oberg* (state), 320 Or at 549.

---

[10] After the *Oberg* (state) decision, the 1995 Oregon Legislature codified the
*Oberg* (state) standard of post-verdict review in ORS 18.537. Or Laws 1995, ch 688,
§ 2. That statute provides, in part:

"(2) If an award of punitive damages is made by a jury, the court shall
review the award to determine whether the award is within the range of dam-
ages that a rational juror would be entitled to award based on the record as a
whole, viewing the statutory and common-law factors that allow an award of
punitive damages for the specific type of claim at issue in the proceeding."

ORS 18.537 became effective after the trial in this proceeding. Or Laws 1995, ch
688, § 6.

[11] Article VII (Amended), section 3, of the Oregon Constitution, provides, in
part:

"In actions at law, where the value in controversy shall exceed $750, the
right of trial by jury shall be preserved, and no fact tried by a jury shall be
otherwise re-examined in any court of this state, unless the court can affirma-
tively say there is no evidence to support the verdict. * * *"

■     Before the people adopted Article VII (Amended), section 3, in 1910, an Oregon trial court had the power to set aside a jury's verdict when it considered the verdict to be excessive. *See, e.g., Lindsay v. Grande Ronde Lumber Co.*, 48 Or 430, 438-39, 87 P 145 (1906) (duty of trial court to set aside excessive jury verdict); *Nelson v. Oregon Railway Etc. Co.*, 13 Or 141, 142-43, 9 P 321 (1886) (same). It was well settled at that time that a trial court's refusal to set aside a jury verdict as excessive could not be reviewed on appeal (except when there was "no evidence to support the verdict"), "because [that decision] does not present a question of law, but one of fact[.]" *Lindsay*, 48 Or at 438. Under Article VII (Amended), section 3, however, courts no longer have a common-law power to review punitive damages awards for excessiveness. *See Van Lom*, 187 Or at 94 (so stating). In *Van Lom*, the court emphasized the importance of a litigant's state constitutional guarantee to a jury trial[12] and concluded that the purpose of Article VII (Amended), section 3, was

> "to eliminate, as an incident of jury trial in this state, the common law power of a trial court to re-examine the evidence and set aside a verdict because it was excessive or in any other respect opposed to the weight of the evidence."

*Id.* at 99. Consequently, the court held that, under the Oregon Constitution, a reviewing court may examine the record only "to determine whether it can affirmatively say there is no evidence to support the verdict." *Id.* at 95 (internal quotation marks omitted); *see also State v. Brown*, 306 Or 599, 604, 761 P2d 1300 (1988) (fact decided by jury may not be reexamined unless reviewing court can say affirmatively that there is no evidence to support jury's decision); ORCP 64 B(5) (trial court may grant new trial if evidence is insufficient to justify verdict or is against the law); *Hill v. Garner*, 277 Or 641, 643, 561 P2d 1016 (1977) (court may not grant judgment notwithstanding verdict if there is any evidence to support verdict). As noted by the Supreme Court in *Oberg* (federal), between 1910 and 1995, Oregon was the only state in the Union that did not have some form of post-verdict judicial

---

[12] That right is found in Article I, section 17, of the Oregon Constitution, which provides: "In all civil cases the right of Trial by Jury shall remain inviolate."

review of the amount of a punitive damages award. *Oberg* (federal), 512 US at 427-28.

■ The defendants in *Oberg* (state) challenged the jury's punitive damages award as excessive under the Due Process Clause of the Fourteenth Amendment. 320 Or at 547. In response to that challenge, *Oberg* (state) announced the standard that this court determined was required by the *federal constitution* for post-verdict review of punitive damages awards. 320 Or at 549-51. Similarly, defendant in this proceeding challenges the jury's $1 million punitive damages award as excessive. As is made clear from the preceding discussion, in Oregon, except for issues arising on review under ORS 18.537, a challenge to a punitive damages award may be made only under the Due Process Clause of the Fourteenth Amendment. By relying on the Fourteenth Amendment as the source for that challenge, defendant has not conceded the reasonableness of the punitive damages award under the rational juror standard articulated in *Oberg* (state).

As noted, defendant questions the validity of the *Oberg* (state) standard following the Supreme Court's decision in *Gore*. We find no suggestion in *Gore* that the Court changed the existing standard—gross excessiveness—or excluded judicial consideration of other factors that might be relevant in assessing whether a punitive damages award is excessive. In *Oberg* (federal), the Court stated:

> "Although courts adopting a more deferential approach use *different verbal formulations*, there may not be much practical difference between review that focuses on 'passion and prejudice,' 'gross excessiveness,' or whether the verdict was 'against the great weight of the evidence.' All of these may be rough equivalents of the standard this Court articulated in *Jackson v. Virginia*, [443 US 307, 324, 99 S Ct 2781, 61 L Ed 2d 560 (1979)] (whether 'no rational trier of fact could have' reached the same verdict)."

512 US at 432 n 10 (emphasis added). That statement was one of two passages from *Oberg* (federal) that led this court to conclude in *Oberg* (state) that the correct standard is whether the award of punitive damages is within the range that a rational juror would be entitled to award in light of the record

as a whole. *Oberg* (state), 320 Or at 550-51.[13] In other words, the rational juror inquiry merely is one of the "different verbal formulations" of the "grossly excessive" standard previously adopted by the Supreme Court. Subsequently, in *Gore*, the Court adhered to its "gross excessiveness" standard:

> "Only when an award can fairly be categorized as '*grossly excessive*' * * * does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment."

517 US at 568 (emphasis added). We conclude, therefore, that the rational juror standard is compatible with and does not differ practically from *Gore*'s gross excessiveness inquiry, and that *Gore* has not "superseded" the rational juror standard that this court articulated in *Oberg* (state).

We find further support for our conclusion in the *Gore* Court's discussion of the "guideposts." To begin with, the *Gore* majority did not reject the standards of review that the Alabama Supreme Court already had applied—standards that the Supreme Court previously had endorsed in *Haslip*. Moreover, on more than one occasion, the Court expressly has stated that the federal excessiveness standard cannot be defined by a formula or a bright line. *See id.* at 582 (rejecting notion that "the constitutional line is marked by a simple mathematical formula"); *see also TXO*, 509 US at 455-58 (refusing to formulate "test" for determining whether particular punitive damages award is "grossly excessive"); *Haslip*, 499 US at 18 ("We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case."). Accordingly, we conclude that the guideposts announced in *Gore* are additional factors for the reviewing court in Oregon to consider as part of the *Oberg* (state) rational juror review.

---

[13] The second passage from *Oberg* (federal) that this court relied on in *Oberg* (state), 320 Or at 550, for guidance stated:

> "What we are concerned with is the possibility that a culpable defendant may be unjustly punished; evidence of culpability warranting some punishment is not a substitute for evidence providing *at least a rational basis* for the particular deprivation of property imposed by the State to deter future wrongdoing."

*Oberg* (federal), 512 US at 429 (emphasis added).

■ ■   In summary, the rational juror inquiry survives as the standard for post-verdict judicial review of an award of punitive damages in Oregon under the Fourteenth Amendment. A jury's punitive damages award is not "grossly excessive"—and, therefore, will not be disturbed on review—if it is within the range that a rational juror would be entitled to award in light of the record as a whole. Combining the factors announced by the Supreme Court in *Gore* with those announced by this court in *Oberg* (state), the range that a rational juror would be entitled to award depends on the following: (1) the statutory and common-law factors that allow an award of punitive damages for the specific kind of claim at issue, *Oberg* (state), 320 Or at 549; (2) the state interests that a punitive damages award is designed to serve, *Gore*, 517 US at 568; (3) the degree of reprehensibility of the defendant's conduct, *id.* at 575; (4) the disparity between the punitive damages award and the actual or potential harm inflicted, *id.* at 580; and (5) the civil and criminal sanctions provided for comparable misconduct, *id.* at 583.

Before we can apply those factors to this proceeding, we must consider two preliminary procedural issues regarding judicial review of a punitive damages award: (1) the factual record to which the court addresses its review; and (2) the remedies available if the reviewing court concludes that an award of punitive damages is grossly excessive. We turn now to the first issue.

■   In Oregon, calculating punitive damages is the function of the jury. *Van Lom*, 187 Or at 108. Since its adoption, Article VII (Amended), section 3, of the Oregon Constitution, has prevented Oregon courts from reviewing punitive damages awards for alleged excessiveness unless there was no evidence to support the jury's verdict. *Id.* at 110-13. Under *Oberg* (federal), and *Gore*, however, the federal constitution requires the availability of post-verdict judicial review of punitive damages awards. Although application of the gross excessiveness standard is a question of law, we recognize that, as part of that application, the reviewing court must "re-examine" the facts in the record—a requirement that is contrary to Oregon law. As this court noted in *Oberg* (state):

"In *Van Lom* * * *, this court held that an assessment of punitive damages is a question of fact committed to the decision of a jury, to which Article VII (Amended), section 3, applies. Therefore, a trial or appellate court is prohibited from reviewing an award of punitive damages if there is evidence in the record to support a jury's finding that punitive damages should be awarded. * * * It is that aspect of the holding in *Van Lom*, construing Article VII (Amended), section 3, that comes into direct conflict with the decision of the Supreme Court of the United States in this case, [*Oberg* (federal)], concerning the requirements of federal due process. Under the Supremacy Clause, we are bound to follow the requirements of federal due process in the face of that conflict."

320 Or at 548-49 (footnotes and citations omitted).

■      Although the federal requirement of judicial review for excessiveness directly conflicts with the re-examination clause of Article VII (Amended), section 3, of the Oregon Constitution, that requirement has not altered the parties' right, under Article I, section 17, of the Oregon Constitution, to a trial by jury regarding a claim for punitive damages. As is true in other contexts, the proper response of an Oregon court to the overlapping and potentially conflicting requirements of federal and state constitutional law is to give effect, to the greatest extent possible, to *all* pertinent constitutional requirements. That principle applies in the context of judicial review of a punitive damages award.

■      Accordingly, because the amount necessary to punish what has occurred and deter its repetition is a question for the jury, we hold that, when reviewing a punitive damages award for excessiveness, the reviewing court must view the facts in the light most favorable to the jury's verdict if there is evidence in the record to support them. *See generally Gore*, 517 US at 579-80 (accepting jury's finding that BMW suppressed material fact that it was obligated to communicate to customers under Alabama law, but determining that BMW's omission was not sufficiently reprehensible to justify $2 million punitive damages award); *Haslip*, 499 US at 13 (no reason to question jury finding when it is supported by record). In other words, the reviewing court must resolve all disputes regarding facts and factual inferences in favor of the jury's

verdict and then determine, on the facts as the jury was entitled to find them, whether the award violates the legal standard of gross excessiveness. The reviewing court's examination of the "record as a whole" is limited to the evidence that was before the jury. *Oberg* (state), 320 Or at 552-56.

▮ Those same overlapping and potentially conflicting requirements of federal and state constitutional law are relevant to our consideration of the second procedural issue noted *ante*, concerning the remedies available if the reviewing court concludes that an award of punitive damages is excessive. We turn now to that issue.

As noted, the federal requirement of judicial review of a punitive damages award for excessiveness protects a party from entry of a judgment that contains a grossly excessive award of punitive damages. However, that requirement has not altered the parties' right, under Article I, section 17, of the Oregon Constitution, to a trial by jury regarding a claim for punitive damages, including the determination of the amount of punitive damages. For example, the federal requirement of judicial review does not empower Oregon courts to disturb a jury's award and enter an award of punitive damages that the court regards as not excessive. Accordingly, if a court reviews a punitive damages award and determines, as the trial court did here, that some lesser amount is the highest amount that a jury lawfully could award, then the court must protect the moving party from entry of a judgment for the excessive amount, but at the same time must give effect, to the extent practicable, to the state-protected right to have a jury determine the amount of a punitive damages award. Courts can fulfill both federal and state constitutional obligations, and avoid a potential conflict in those requirements, by proceeding as follows when reviewing a jury's award of punitive damages.

▮ A party may challenge a jury's punitive damages award as excessive under the Fourteenth Amendment by filing a motion for a new trial under ORCP 64 B(5), which provides:

> "A former judgment may be set aside and a new trial granted in an action where there has been a trial by jury on the motion of the party aggrieved for any of the following

causes materially affecting the substantial rights of such party:

"\* \* \* \* \*

"B(5)   Insufficiency of the evidence to justify the verdict or other decision, or that it is against the law."

*See also Oberg* (state), 320 Or at 552 n 9 (defendants' challenge to punitive damages award on ground of excessiveness appropriately raised in trial court in motion for new trial).[14]

In response to the motion, the reviewing court must determine whether the jury's award is grossly excessive under the standards discussed in this opinion. If the answer is yes, then the reviewing court, in addition, should determine, by applying the same standards, the upper limit of the range, or the highest lawful amount, of punitive damages that a rational juror could award, consistent with the Due Process Clause, based on the record as a whole. Unless the nonmoving party agrees to entry of an amended judgment for the reduced amount of punitive damages determined by the court, the court must grant a new trial.

The procedure described above is required to protect the nonmoving party's right to a jury trial regarding the issue of punitive damages.[15] That procedure also protects the moving party's right to a jury trial. That is, the jury trial and verdict afford the moving party the right to a jury trial protected

---

[14] In this proceeding, defendant filed motions for directed verdict (ORCP 60) and for JNOV (ORCP 63) on the ground that there was "no evidence to support [plaintiff's] punitive damages claim." *See* ORCP 63 A (condition precedent to motion for JNOV is motion for directed verdict); *Vancil v. Poulson*, 236 Or 314, 320, 388 P2d 444 (1964) (grounds asserted in motion for JNOV must have been raised in preceding motion for directed verdict). However, a party cannot challenge a verdict for punitive damages as excessive until *after* the jury renders its verdict. Therefore, that challenge properly is made by a motion for new trial (ORCP 64 B(5)). A motion for new trial on the ground that a jury's punitive damages award is excessive may be joined with a motion for JNOV, or may be made on its own. *See* ORCP 63 C (motion in alternative for new trial may be joined with motion for JNOV).

[15] The United States Supreme Court has reached the same conclusion under the Seventh Amendment to the United States Constitution. *Hetzel v. Prince William County*, 523 US 208, 211, 118 S Ct 1210, 140 L Ed 2d 336 (1998) (imposition of reduced punitive damages award without allowing nonmoving party option of new trial "cannot be squared with the Seventh Amendment"). Although the Seventh Amendment does not apply through the Fourteenth Amendment to the states, *Minn. & St. Louis R. R. v. Bombolis*, 241 US 211, 36 S Ct 595, 60 L Ed 961 (1916), with the exception of the final phrase, that amendment almost is identical to Article VII (Amended), section 3, of the Oregon Constitution. The Seventh Amendment provides:

by the Oregon Constitution. The moving party's motion for a new trial, on the ground that the jury's verdict is grossly excessive, signifies that party's election for a reexamination by the court of the jury's punitive damages award under the legal standard required by the Due Process Clause. After conducting that reexamination, the court must deny the motion for new trial on that ground if the award meets the required standard. If the award fails that test, however, then the court must grant a new trial unless the nonmoving party agrees to entry of an amended judgment for a reduced amount of punitive damages, as determined by the reviewing court.[16] Each party may seek appellate review of any determination by the court to which it timely objects. In any event, the procedure discussed above affords both the moving party and the nonmoving party with all to which they are entitled under the state and federal constitutions.

We turn to our review of the jury's punitive damages award in this proceeding, beginning with the statutory and common-law factors that allow an award of punitive damages for a UTPA violation in Oregon. *Oberg* (state), 320 Or at 552-56.

The substantive criteria to be considered by an Oregon factfinder in deciding whether to make an award of punitive damages in an action for unlawful trade practices are set out in ORS 646.638. That statute provides that punitive damages may be awarded when a person has suffered

"any ascertainable loss of money or property * * * as a result of willful use or employment by another person of a method, act or practice declared unlawful by ORS 646.608[.]"

---

"In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."

[16] *See generally Adcock v. Oregon Railroad Co.*, 45 Or 173, 178-81, 77 P 78 (1904) (defendant who moves for new trial on ground that punitive damages award is excessive is not deprived of right to jury trial when trial court overrules motion for new trial on condition that plaintiff agree to reduced damages award).

In this case, the trial court instructed the jury that it could consider awarding punitive damages if it found that defendant "willfully engaged in * * * unlawful trade practices." The jury so found.

The court also instructed the jury that, to award punitive damages, plaintiff had to prove by clear and convincing evidence that defendant had engaged in conduct "amounting to a particularly aggravated, deliberate disregard of the rights of others." *See former* ORS 41.315 (1993), *repealed by* Or Laws 1995, ch 688, § 6 (plaintiff must prove entitlement to punitive damages by clear and convincing evidence); UCJI 75.02 (so defining "wanton" misconduct). Finally, the trial court instructed the jury that, in setting an award for punitive damages, it should consider: (1) the character of defendant's conduct; (2) defendant's motive; and (3) the "sum of money that would be required to discourage the defendant and others from engaging in such conduct in the future."

■■■ We agree with the trial court and the Court of Appeals that the record in this proceeding reveals that defendant committed "an extraordinarily egregious violation" of the UTPA. *Parrott*, 156 Or App at 272. At trial, plaintiff presented evidence that permitted the jury to conclude, by clear and convincing evidence, that defendant acted with a deliberate disregard of the rights of others "of a magnitude evincing a high degree of social irresponsibility." *Schmidt v. Pine Tree Land Dev.*, 291 Or 462, 466, 631 P2d 1373 (1981). As noted by the Court of Appeals,

"[t]here was evidence from which the jury could have found that defendant knew of the extensive defects of the Suburban and of its branded title and odometer discrepancy, and that it concealed those facts from plaintiff. There was evidence from which the jury could have concluded that defendant's treatment of plaintiff was not an isolated incident in that it had established business procedures that it could employ to cover any failure to disclose. There was evidence that defendant also used abusive tactics to cover its deceptions. Furthermore, from the evasive, inconsistent, and implausible explanations given by defendant's representatives as to defendant's business practices, the jury could

infer that defendant had no intention of altering its practices in the future."

*Parrott*, 156 Or App at 272-73.

▮▮ Next, we identify the state interests that punitive damages are designed to advance in this proceeding. *Gore*, 517 US at 568. Following the lead of the Supreme Court in *Gore*, we focus our attention on the scope of Oregon's legitimate interests in punishing defendant and deterring it from future misconduct. *Id.* The state interest served by a punitive damages award under the UTPA is protection of the consumer. It is unquestionable that Oregon has a significant interest in protecting its citizens from deceptive trade practices. *See, e.g., id.* ("No one doubts that a State may protect its citizens by prohibiting deceptive trade practices[.]"). It also is clear that Oregon's interests were implicated by defendant's tortious conduct. Plaintiff proved that defendant willfully engaged in deceptive business practices in Oregon. *Cf. id.* at 572-73 (state "does not have the power * * * to punish [a defendant] for conduct * * * that had no impact on [the state] or its residents").

▮ We consider next the degree of reprehensibility of defendant's conduct. *Id.* at 575. As stated by the Supreme Court in *Gore*, the degree of reprehensibility of defendant's conduct is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award[.]" *Id.* In *Gore*, the Court concluded that the defendant's conduct was not "particularly reprehensible," because the harm was "purely economic" and because there was no evidence that the defendant had "repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful[.]" *Id.* at 576.

▮ Unlike in *Gore*, the tortious conduct in this proceeding did not involve undisclosed cosmetic damage to a new vehicle. Rather, defendant made material misrepresentations about the Suburban's condition that affected its value. As a result of the Suburban's defects, plaintiff was unable to obtain comprehensive insurance coverage. Additionally, when the Suburban's then-current registration expired, he would have been unable to drive it within the Portland metropolitan area because it could not have been brought into DEQ compliance. Moreover, defendant's failure to disclose

that the Suburban previously had been damaged also implicated its overall safety and evinced an indifference not only to plaintiff's health and safety, but also to the health and safety of the general public that would share the road with a potentially unsafe vehicle.

As stated by the Supreme Court in *Gore*, the "infliction of economic injury, especially when done intentionally through affirmative acts of misconduct * * * can warrant a substantial penalty." *Id.* Plaintiff did suffer economic injury, but defendant inflicted that injury intentionally through affirmative misrepresentation of material facts.

Additionally, plaintiff established that defendant's misconduct was part of defendant's day-to-day business dealings and was not limited to the sale of the Suburban to plaintiff. Defendant acknowledged that it never had completed the DMV forms that would have alerted customers to odometer discrepancies. Defendant failed to train its title clerks to look for odometer discrepancies. Defendant's employees asked customers to sign blank or incomplete forms so that defendant could disclaim awareness of odometer discrepancies. In addition, defendant's representations about its sales forms were inconsistent and misleading.

As the trial court noted, "this jury found that [defendant] intentionally took advantage of [plaintiff] in a very blatant sort of way." We agree. Defendant's business practices were designed to facilitate nondisclosure to customers. Defendant deliberately misrepresented or failed to disclose to plaintiff material information that implicated the value and safety of the Suburban. Defendant also demonstrated a willful disregard of the legislative protections for Oregon consumers and an unwillingness to modify its practices. Those factors distinguish this case from the injury suffered by the plaintiff in *Gore*. We conclude that defendant's conduct was highly reprehensible.

The third factor that we consider is the disparity between the punitive damages award and the actual or potential harm inflicted on plaintiff. *Id.* at 580. That inquiry focuses not only on whether there is a reasonable relationship between the punitive damages award and the harm that actually occurred, but also between the punitive damages

award and "the harm likely to result[.]" *Id.* at 581. The Supreme Court expressly has rejected, however, "the notion that the constitutional line is marked by a simple mathematical formula[.]" *Id.* at 582. The Court also has noted that

> "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if * * * a particularly egregious act has resulted in only a small amount of economic damages[,]"

and that, "[i]n most cases, the ratio will be within a constitutionally acceptable range[.]" *Id.* at 582-83.

In *Gore*, the Court found that the "breathtaking" 500 to 1 ratio "must surely 'raise a suspicious judicial eyebrow.' " *Id.* at 583 (*quoting TXO*, 509 US at 481 (O'Connor, J., dissenting)). Just three years earlier, however, in *TXO*, the Court had approved a punitive damages award that was 526 times greater than the compensatory damages award. 509 US at 459-62. And, two years before the *TXO* decision, the Court had referred to the 4 to 1 ratio in *Haslip* as being "close to the line." *Haslip*, 499 US at 23. The Court's inconsistent treatment of this particular factor demonstrates that no "simple mathematical formula" controls our review of the ratio of punitive damages to actual and potential harm. *Gore*, 517 US at 582.

In this proceeding, the ratio between punitive and compensatory damages is 87 to 1. Because defendant's tortious conduct was a routine part of its business practice that it was unwilling to change, we also consider the potential injury that its misconduct may have caused to past, present, and future customers. Additionally, although the actual economic harm that plaintiff suffered in this proceeding was relatively small, that harm was the result of defendant's "particularly egregious" acts. *Id.* Taking all those considerations together, the ratio between the punitive damages award and the actual damages award in this proceeding does not "raise [our] suspicious judicial eyebrow." *Id.* at 583 (internal quotation marks omitted).

Finally, we compare the jury's punitive damages award and "the civil or criminal penalties that could be imposed for comparable misconduct[.]" *Id.* According to *Gore*,

penalties for comparable misconduct are relevant to whether defendant was on notice of "the severity of the penalty" that might be imposed. *Id.* at 574.

■ The UTPA explicitly authorizes an award of punitive damages in an action for violations of that act. ORS 646.638(1). The UTPA also provides for administrative sanctions ranging from the extraction of an assurance of voluntary compliance, ORS 646.632(2), to injunctive relief, ORS 646.632, and the loss of a business license, ORS 646.646. In addition, the UTPA authorizes the imposition of other civil remedies, including civil penalties of up to $25,000 per violation, ORS 646.642, restitution, ORS 646.636, and attorney fees, ORS 646.632(8). Although the UTPA also authorizes lesser sanctions, we agree with plaintiff that a regulatory scheme of sanctions that includes interruption or closure of business operations provides sufficient notice to a business defendant that its violation of the law could have serious economic consequences.

■ Defendant argues that, based on reported Oregon judgments in other UTPA proceedings, "Oregon gave [defendant] no notice that it might impose a penalty this severe." Although punitive damages awards previously imposed for UTPA violations in Oregon generally are instructive, we disagree that defendant had "no notice" that a jury might impose a punitive damages award in this range. Before trial, in response to plaintiffs' second amended complaint seeking $1 million in punitive damages on various claims, defendant stipulated that it "would be able to meet *any* punitive damage award."[17] (Emphasis added.) In light of that stipulation, and considering the range of sanctions provided by the UTPA itself, we conclude that defendant was on notice of the magnitude of the sanction that the jury might impose.

■ In summary, after considering (1) the statutory and common-law factors that allow an award of punitive damages for a UTPA violation; (2) the state's interest in protecting Oregon consumers by punishing violators of the UTPA and deterring them and others from similar misconduct; (3) the reprehensible nature of defendant's conduct; (4) the ratio

---

[17] The court did not inform the jury about defendant's stipulation.

between punitive damages awarded and the actual and potential harm caused by defendant's tortious conduct; and (5) the range of sanctions provided under the UTPA for comparable misconduct and defendant's stipulation that it could pay "any punitive damages award," we conclude that $1 million is within the range that a rational juror would be entitled to award in light of the record as a whole. The jury's punitive damages award in this case was not grossly excessive in violation of the Due Process Clause of the Fourteenth Amendment.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court with instructions to reinstate the jury's $1 million punitive damages award.