Argued and submitted September 19, reversed and remanded for new trial
December 19, 2001

Joseph SCHLIMGEN,
Personal Representative for the Estate of
Michael F. Schlimgen, deceased,
*Respondent,*

*v.*

MAY TRUCKING COMPANY,
an Idaho corporation,
*Appellant.*

9803-02267; A107409

37 P3d 1005

Gordon T. Carey, Jr., argued the cause and filed the briefs for appellant.

Michael T. Garone argued the cause for respondent. With him on the brief were Karen O'Kasey and Schwabe, Williamson & Wyatt, P.C.

Before Landau, Presiding Judge, and Brewer and Schuman, Judges.

SCHUMAN, J.

## SCHUMAN, J.

After deliberating for nearly two days, after twice announcing to the trial court that it was deadlocked on the issue of apportioning fault, and after receiving two supplemental instructions urging it to continue deliberating, the jury in this negligence case returned a verdict finding defendant 60 percent at fault. Defendant appeals, arguing that the trial court's instructions violated the rule against coercing a deadlocked jury into reaching a verdict. Plaintiff maintains that the rule does not apply in civil cases and that, in any event, the trial court in this case did not give a coercive instruction. We agree with defendant—the rule applies, and the instructions were coercive—and reverse.

Plaintiff is the personal representative of Michael Schlimgen (Schlimgen), who was killed when a tractor-trailer driven by Kelley, defendant's employee, jackknifed on I-5 near an on-ramp south of Portland. Most of the facts were vigorously contested at trial. This much is undisputed: Schlimgen, a tow truck driver, arrived at a point just south of the southbound on-ramp in order to move a flatbed truck that had skidded off the pavement. Schlimgen parked his tow truck off the road and started to set up a line of orange warning triangles to divert traffic away from the area where he intended to work. Meanwhile, Kelley was driving southbound in the far right lane of I-5. Just before he reached a point where the on-ramp finishes merging into the highway, the driver of a Honda, attempting to enter from the on-ramp, sped up, pulled past Kelley's truck on the right, cut left in front of it, and slowed abruptly. Kelley slammed on his brakes but could not avoid colliding with the Honda, sending it into a spin. At the same time, Kelley's tractor-trailer jackknifed and skidded, rotating 180 degrees before coming to a stop. One or both of the vehicles struck Schlimgen. The Honda crashed into Schlimgen's tow truck. When it was all over, Schlimgen lay dead on the gravel shoulder.

The parties disagreed on such key questions as whether the Honda or the truck, or both, had struck Schlimgen; whether Schlimgen was struck while standing on the shoulder, the on-ramp, or the highway; whether Kelley

had adequately inspected the brake system on his tractor-trailer before his departure; and whether Schlimgen followed required safety procedures in setting out the warning triangles.

After two weeks of testimony, argument and instructions, the jury began deliberations on a Friday morning. It had a special verdict form containing four questions: (1) Was defendant negligent? (2) Was Schlimgen negligent? (3) If both were negligent, what was the percentage of each one's fault? (4) If Schlimgen's fault was 50 percent or less, what are plaintiff's damages? After deliberating all day, the jury had not returned a verdict and elected to resume deliberation on Saturday. At around 11:30 a.m. on Saturday, the jury notified the trial court by note that it was deadlocked. The note stated:

> "Your Honor, here is our current situation. Nine jurors have agreed that [defendant] and Michael Schlimgen have some negligence in this case that led to Mike Schlimgen's death, that is, the same nine jurors agree that at least one of the declarations of negligence for the plaintiff and the defense contributed to Michael Schlimgen's death. We cannot agree on a percentage for question No. 3. We are at a seven to two standstill. At this time we believe that we are deadlocked on question No. 3. Where do we go from here?"

The jury also indicated that it would adjourn for the day at noon. The trial court returned a note directing jurors to return on Monday for further deliberations.

On Monday at around 9:00 a.m., the jury reconvened and deliberated until 11:30 a.m., when the presiding juror reported that the deadlock continued. The trial court then instructed the jury. Because the outcome of this case depends in part on whether the overall content and tenor of the instruction were coercive, we reproduce it in its entirety.

> "At this point I want you to be very careful not to say anything that will give any indication of which way your jury is leaning in this divided case. My interest as the trial judge is not in the result that you reach. I told you that as part of the instructions. My interest is in the process that

you follow. And of course my interest, as well as your interests and the interests of the parties is to get this case resolved.

"I appreciate very much that the trial was burdensome upon you, and that burden has extended long beyond any of us—what any of us contemplated or wanted. I'd point out that that alone is a reason not to become angry and upset and not proceed to decide the case. In fact, it's just the reverse. That's a real reason for you to put in the last effort and get this case resolved.

"Now, if you, on the basis of what you've heard, don't resolve this case, we're going to pick another group of jurors, and we're going to hear this case again. And I would suggest to you that it's doubtful that we're going to find a group of people any more reasonable than you, and it's doubtful that those jurors are going to be presented with any better evidence to decide these issues than you were presented with. And it's going to be very burdensome collectively on everyone to proceed through this again and find ourselves sitting in exactly this situation with 12 jurors who have a very difficult decision to make in order to resolve this.

"This is a case—a problem that's not going to go away. It's got to be resolved. Now, I'm going to ask you to continue deliberating. I do want you to understand, as I said in the initial instructions, that you should deliberate in the full sense of the word, you should consider the reasoning, the arguments and the opinions of all of the other jurors, and you should be willing to explain to the other jurors the reasoning and arguments that cause you to take the position that you take.

"And I urge you to try to fully understand what the other jurors are saying and doing and why they're doing it, and for you to make every effort to try to explain to them why you're taking the position that you are taking, and that you do this with an open mind and for the purpose of attempting to resolve the questions that remain between you.

"But now I would caution you that while I've talked about the importance of resolving the case, I also want to remind you of the importance of your individual decision in the case. And while it's your responsibility to deliberate and

to be open minded and to continually reevaluate your position, and to in fact change your position if you're persuaded, through the deliberations, that your original position was incorrect and that another position is correct, it would not be appropriate for you to sacrifice your honest opinion as to the weight of the evidence or the ultimate result of the case just to reach a verdict. When you do return with a verdict, the verdict has to be one in which you agree.

"Now, I'm going to ask that you return to the jury room, that you deliberate further, that you attempt to resolve this, and we will await to hear from you as to whether you've been successful or not. But I do wish that you speak fully about these instructions and about where you are, not just go in the jury room and turn around and hit the buzzer out of pique, and come back in and say, you know, 'We told you before, we can't resolve this.' That won't do any of us any good.

"Try to be patient. Now, be cautious not to say anything that's going to let these lawyers have any idea which way your jury is leaning because that's going to make it more difficult for me to proceed with this, if one side or the other perceives the case—perceives themselves to be at a disadvantage, then my difficulties in managing this are going to become much more difficult."

The presiding juror then addressed the court:

"We came in on Saturday for three hours and deliberated this case and came to the same conclusion on Saturday that we have just come to the conclusion. When we came in this morning, we were fully ready to say this statement since you folks weren't available on Saturday and have you give us this discussion. I would assume you would have given us this discussion that you've just given us.

"When I came in this morning, I said to the group, 'I think that we need to sit down dispassionately, go over the evidence again.' I have had each of the people on the jury get up and go through and give a scenario, talk about the liability issues that were stated on both sides of the case, try to determine whether they felt—based on the evidence, the way they saw it, I had virtually everybody go through this thing and say what they thought happened with the various vehicles and the various people involved with it, and what evidence they were using to make a decision, and each

of us have done that this morning. We spent about two hours doing it.

"And I said—after that I said, 'Now, I want you to each look at the liabilities that we have,' we have them written on a chart there that came off you—the list of issues you gave us, and I said, 'Tell us what you think the liabilities we're hearing, did these things lead to the death of Mr. Schlimgen?' And then we re-voted on issues 1 and 2, and voted on issue 3, and we've come to the conclusion that we just cannot, any of us, reach a—the necessary majority to have a decision one way or the other."

The trial court then instructed the jury as follows:

"Well, I'm not going to be arbitrary. And yes, you did proceed on Saturday, yes, you're proceeding today. It's now two weeks from the time that we started the trial. Collectively we have I don't know how many months of—12—we have several months of time—one—the equivalent of one person working several months, just in the trial, let alone all of the preparation that was made.

"I've spoken to you. If you go back, and you say, 'I listened to what Judge Redding said, and there's no hope, we're not going to settle it,' then I'm not going to jail you. But I'm having this conversation with you because I want you to know that while this is going to be over for you, it is not going to be over for the community. This case will be decided. We will start again. We will pick another jury. We will listen through all of the evidence and the questions, and probably more, because my experience is when cases have to be retried, they do not become less complex. They do not become shorter. They become longer. Everything that was asked before gets asked again, in several different ways.

"We—and if you, as you've said, honestly can't decide the case, then we'll get another group of—start with 30 jurors, we'll winnow through them, we'll excuse some, we'll take others, we'll have alternates. You've been here. Took eight days last time. Going to take that amount of labor and more the next time.

"If you tell me that that's what is necessary because of your views, then I'll respect that, and then we will proceed. But it's a very serious decision to make. The decision not to decide is as important as the decision is to decide the case.

"I'll wait for you. Please give me the courtesy of talking it over, and I'll wait for what you tell me."

The jury resumed deliberations, took a 75-minute lunch break, and, at 2:00 p.m., returned a verdict finding that Schlimgen and defendant were both negligent and apportioning the fault 40 percent to Schlimgen and 60 percent to defendant.

■■ On appeal, defendant argues that, in *State v. Marsh*, 260 Or 416, 490 P2d 491 (1971), the Supreme Court prohibited the use of verdict-urging instructions, also called "dynamite" instructions because they are used to "blast loose" a deadlocked jury, or *Allen* instructions after the case in which the United States Supreme Court first dealt with them. *See Allen v. United States*, 164 US 492, 17 S Ct 154, 41 L Ed 528 (1896). Plaintiff, on the other hand, argues that the prohibition does not apply in civil cases and that, in any event, the instructions here were not coercive. We review the question whether the *Marsh* rule applies in civil cases as a question of law, and, although trial judges have discretion to give deadlock instructions, *Marsh*, 260 Or at 443, we also review as a matter of law whether a particular instruction is coercive. *State v. Hutchison*, 142 Or App 56, 59, 920 P2d 1105, *rev den* 324 Or 395 (1996).

Plaintiff correctly notes that, in *Marsh*, the Oregon Supreme Court explicitly limited its analysis to criminal cases, noting that application in a civil context was "a question not before this court." 260 Or at 443 n 57. Plaintiff argues that we should preserve that limitation. The legal rationale for prohibiting coercive instructions in criminal cases, he argues, is of constitutional magnitude: Such instructions operate most frequently in cases where a few jurors hold out for acquittal and allegedly are coerced into voting for conviction, thereby depriving a criminal defendant of the presumption of innocence and the protection of the "proof beyond a reasonable doubt" standard. Those concerns, plaintiff notes, are not implicated in civil cases, so jurors need less protection from judicial intervention.

■ We disagree. The difference between the levels of certainty needed to reach a criminal verdict and a civil verdict is reflected in the different standards of proof and degrees of

consensus required, not in the degree to which jurors should be free from coercion.[1] Juror independence, unlike the rights of the accused in criminal cases, was a major topic of debate at the Constitutional Convention of 1857; it "elicited one of the most interesting, lengthy and animated discussions" of the gathering. Charles H. Carey, ed., *The Oregon Constitution and Proceedings and Debates of the Constitutional Convention of 1857,* 310-11 (1926) (quoting *The Oregonian*, October 3, 1857). The debate did not focus on *whether* jurors should be independent of judicial intervention, but *how* independent they should be, and the resolution was: *very* independent.

The Bill of Rights Committee, one of the 10 committees into which the convention divided for purposes of drafting various articles, *id.* at 90, 100, proposed a section modeled on Article I, section 19, of the Indiana Constitution, guaranteeing that "[i]n all criminal cases whatever the jury shall have the right to determine the law and the facts." *Id.* at 310. Matthew Deady, chair of the convention and a judge, objected. He offered an amendment reading, "In all trials by a jury the court shall decide the law, and the jury the facts." *Id.* at 311. That proposal moved another influential delegate, Thomas Dryer, editor of *The Oregonian*, to remark in rebuttal that "[e]very juryman of sense could understand the law and judge of it just as well as any judge who ever sat upon the bench." *Id.* at 312. Dryer warned that allowing judges to supersede juries was tantamount to establishing a "judicial monarchy." *Id.* at 314. Ultimately, the delegates reached a compromise, creating what is now Article I, section 16: "In all criminal cases whatever, the jury shall have the right to determine the law, and the facts under the direction of the Court as to the law, and the right of new trial, as in civil cases."

Further, to the extent that the Oregon Constitution distinguishes between the sanctity of civil and criminal jury determinations, the former receives more explicit protection:

---

[1] In criminal cases, "ten members of the jury may render a verdict of guilty or not guilty, save and except a verdict of guilty of first degree murder, which shall be found only by a unanimous verdict, and not otherwise[.]" Or Const, Art I, § 11. "In civil cases three-fourths of the jury may render a verdict." Or Const, Art VII (Amended), § 5(7).

Article I, section 17, specifically announces that "[i]n all civil cases, the right of Trial by Jury shall remain inviolate," and Article VII (Amended), section 3, guarantees that,

"[i]n actions at law, * * * the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any court of this state, unless * * * there is no evidence to support the verdict."

Article I, section 16, quoted above, which deals with juries in criminal cases, does so by referring to civil juries, using their prerogatives as the benchmark.

Modern Oregon courts continue to demonstrate extreme respect for the jury's function in civil cases by using juror independence as the basis for a variety of limits on judicial encroachment. For example, respect for the jury's independence underlies the limit on appellate courts' review of fact issues in civil cases to whether there is any evidence to support them. *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984). Similarly, the Supreme Court has recently observed that a jury's determination of the amount of punitive damages is a fact question and therefore immune from challenge under the state constitution. *Parrott v. Carr Chevrolet, Inc.*, 331 Or 537, 551, 17 P3d 473 (2001). The right to a civil jury trial also provides the basis for Oregon's bar against some statutory damage caps. *Lakin v. Senco Products, Inc.*, 329 Or 62, 81, 987 P2d 463 (1999).

That concern for a jury trial in a civil case includes by necessary implication a concern that the requisite majority of the jury determine the facts without undue influence or coercion, which, in turn, underlies proscriptions against judicial comments or instructions on the evidence or matters of fact, ORCP 59 E, the prohibition of communications with the jury after deliberations have begun, ORCP 59 C, and, most pertinently, the right of the parties to a new trial when "it satisfactorily appears that there is no probability of an agreement" amongst the current members of the jury. ORCP 59 F(1)(a). It also provides the prudential basis for the exercise of our supervisory powers to apply the rule announced in *Marsh* in the civil as well as criminal context. *See State v. Lakeside*, 277 Or 569, 588, 561 P2d 612 (1977), *aff'd* 435 US 333, 88 S Ct 1091 (1978) (recognizing supervisory power of

appellate courts over administration of justice in trial courts); *see also id.* at 590 (Denecke, C. J., dissenting) (citing *Marsh*, 260 Or at 435-44, as an example of the exercise of supervisory power).

We therefore conclude that, in Oregon, the specter of jury coercion is as much a cause for concern in the civil as in the criminal context.[2] We must therefore determine whether the instructions in this case were coercive. *Marsh* provides guidance. In that case, the Supreme Court wrote:

> "We are convinced, however, that the 'Allen charge,' even when 'modified' and 'balanced,' carries a substantial potential for coercion, even though it may not be possible to demonstrate such coercion in a given case. * * * Indeed, there is considerable merit to the contention that * * * the possibility of a hung jury based upon an honest difference in opinion is part and parcel of our jury system.

> "For all of these reasons, we agree with the view that the giving of the 'Allen charge,' even when 'modified' and 'balanced,' involves so many 'pitfalls' and is such an invitation to error as to cause more trouble in the administration of justice than it is worth. We thus agree with those courts which have disapproved the future use of such supplemental instructions to deadlocked juries[.]" 260 Or at 442-43.

The court instructed that any future instructions to a deadlocked jury should be based on the uniform instruction approved by the ABA:

> "It is your duty, as jurors, to consult with one another, and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views, and change your opinion, if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence

---

[2] Many other states have reached the same conclusion, and our research reveals none that has considered and rejected it. *See generally* Gary D. Spivey, Annotation, *Verdict-urging Instructions in Civil Case Stressing Desirability and Importance of Agreement*, 38 ALR 3d 1281 (1971); Gary D. Spivey, Annotation, *Verdict-urging Instructions in Civil Case Admonishing Jurors to Refrain from Intransigence, or Reflecting on Integrity or Intelligence of Jurors*, 41 ALR 3d 1154 (1972).

solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict." *Id.* at 443 n 58.

In addition to this general guidance, *Marsh* also contains more specific instruction. It teaches that, to determine if instructions are coercive, a court should take into account "both the language of the particular instruction and the factual setting or context in which it was given." *Id.* at 432-33. Regarding the particular language of the instruction, the probability of impropriety increases when: (1) the instruction emphasizes persuading the members of the minority of the jury to reconsider their views in light of the majority's position; (2) the charge is not balanced by an emphasis on adhering to conscientiously held opinions; (3) the instruction refers to the necessity or expense of a retrial or to the fact that another jury will hear the same evidence and be no better qualified to decide the case; and most importantly, (4) the instruction informs the jury that it has an obligation to continue deliberating or that a mistrial will not be declared. *Id.* at 425-27. Contextual facts indicating impropriety are: (1) the evidence was in, or close to, equipoise; (2) the trial court knew of the numerical split of the deadlock or which way the jury was leaning, or both; and (3) the jury deliberated for a long time before the instruction was given or reached a verdict shortly thereafter or, most tellingly, both. *Id.* at 428-29.

■ In this case, we begin with the instruction's language itself. In its favor, the instruction did not suggest that the minority jurors should reconsider their votes; rather it encouraged all jurors to "be open minded and to continually reevaluate your position," and not to "sacrifice your honest opinion." Nonetheless, the instruction deviated significantly from the uniform instruction. The trial court added repeated references to "the importance of resolving the case," urging that the case "has got to be resolved." More important, it repeatedly referred to the expense and burden of a retrial. That is an improper consideration for a deadlocked jury and is potentially coercive. *See Marsh*, 260 Or at 436. However, reference to a retrial is only one of four factors identified in *Marsh* as contributing to the facial coerciveness of an instruction. In the absence of the other three, we cannot say that the

instruction as a whole, *id.* at 436, is unduly coercive on its face.

■ Even an instruction more balanced and neutral than this one, however, may have a coercive effect under the circumstances in which it is given. *Marsh*, 260 Or 425 (noting that "the extent to which such an instruction may be coercive depends largely upon the factual context or setting in which the charge is given"); *Hutchison,* 142 Or App at 60 ("The setting in which the instruction was given here compromised the instruction's neutrality."). In *Marsh,* the court discounted contextual factors such as the relative weight of evidence and the time taken after the instruction to reach a verdict in light of countervailing factors: The jury was evenly split, and hence there was no true "minority" to coerce into reaching a verdict, and the jury returned its verdict after reinstruction on an element of substantive law, indicating that the jury's deadlock may have been due to different understandings of the legal arguments rather than an inability to agree on the facts.

■ Here, no such countervailing factors exist. The presiding juror in articulate and forceful terms twice told the trial court that the jury was deadlocked. He also informed the trial court that it was divided seven to two. By telling the court that the jury reached impasse on the apportionment of negligence between defendant and plaintiff, the presiding juror indicated that the jury was in disagreement over the complicated factual dispute at the heart of the trial: whose negligence caused Schlimgen's death, his own or defendant's? The evidence on that question was extensive, contradictory, often complex and technical, and perhaps inconclusive. In such circumstances, the trial court's every word may carry extra weight with the jury, thus imposing a heightened duty to refrain from coercion.

The facts that lead most persuasively to the conclusion that the judge's comments did coerce some members of the jury into changing their votes, however, are the timing and sequence of the trial court's instructions relative to the jury's deliberations. As noted above, after hearing two weeks of testimony, the jury began deliberating on Friday morning. It returned on Saturday and deliberated until almost noon,

when it concluded it was deadlocked. Rather than declare a mistrial at that time, the trial court told the jury to go home and return Monday to confer again. After several hours of further deliberation, the presiding juror announced that the jurors had repeatedly and systematically gone over the evidence, considered each other's interpretations of it, discussed the reasons for their differing positions and still could not reach agreement. Then, after the court's instruction on the importance of this jury resolving the case so as to avoid the time and expense of a retrial, the jury returned a verdict after less than an hour's further deliberation. We conclude that, under those circumstances, the trial court's instruction was improperly coercive, as it evidently led a number of jurors to change their votes, not as a result of reasoned deliberation, but with the goal of reaching the requisite consensus so as to resolve the case. A verdict thus reached cannot stand.

Reversed and remanded for new trial.