[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 27, 2004
THOMAS  K. KAHN
CLERK

_____

No. 03-15189

_____

D. C. Docket No. 92-00147-CV-6

FELIX KEMP, individually and on behalf of
all other persons similarly situated,

Plaintiff-Appellee,

versus

AMERICAN TELEPHONE & TELEGRAPH COMPANY,

Defendant-Cross-Claimant-
Appellant,

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

**(December 27, 2004)**

Before BIRCH, BARKETT and COX, Circuit Judges.

BARKETT, Circuit Judge:

AT&T appeals the district court's denials of its motion for judgment as a matter of law seeking to set aside a jury verdict in favor of Felix Kemp and its motion to reduce the jury's punitive damages award. The jury determined that AT&T was guilty of fraudulent billing practices and the collection of illegal gambling debts in violation of the federal and Georgia RICO statutes. These gambling debts were incurred after Kemp's grandson called a 900-number named "Let's Make a Deal," which offered callers a chance to win various prizes in exchange for a fee. AT&T attempted to collect these debts by including them in Kemp's phone bill as though they were long distance charges. The jury awarded Kemp $115.05 in actual damages, the costs of playing the game, which were then trebled under the RICO statutes, and also awarded Kemp punitive damages of one million dollars. For the reasons given below, we affirm the denial of AT&T's motion for judgment as a matter of law. However, we conclude that the trial court erred by letting the jury's punitive award stand and therefore reduce the award.

## I. BACKGROUND

The "Let's Make a Deal" game ("LMAD") was created by Teleline, Inc., based on the famous television show of the same name. The game ran from early

2

1990 until December 1992.[1]  When participants called the 900 line, they were asked to pick a number using their touchtone phones that corresponded to a figurative "door" that concealed a prize.  If callers guessed correctly, they could either keep the prize or instead proceed to the next "level."  Upon successfully completing all six levels of the game, callers were entitled to a cash prize of $2000. The odds of winning this prize were approximately 1 in 2700.  The cost of playing the game was $3.88 per minute, and there was no set time for how long any particular call would last.

AT&T carried calls to LMAD's 900 numbers over its long distance network and played the prerecorded messages that callers heard when they called the line. Individuals who called LMAD were not charged for the price of a phone call, but instead paid only for the "content" provided by Teleline, namely, the ability to gamble using their phones.  It was Teleline who paid AT&T for the cost of each phone call to LMAD.[2]  Notwithstanding that the charges incurred in playing the game were owed exclusively to Teleline and were not debts for long distance calls, AT&T listed these charges in its long distance phone bill, interspersed with

---

[1] In December 1992, an injunction was entered barring the operation of the game.

[2] The fee Teleline paid to AT&T was based on a standard tariff rate. As a telephone common carrier, AT&T files tariffs with the FCC that define the terms and conditions of its long distance services.  47 U.S.C. § 203.

3

charges for long distance calls. AT&T billed individuals who called LMAD from Georgia $360,252.40 and collected $287,360.59. This disparity is due in part to AT&T's policy of erasing LMAD fees for customers who complained sufficiently about the charges. In exchange for its billing services, AT&T received a commission of six percent of the fees it collected on behalf of Teleline.

Kemp was a long distance customer of AT&T who received a bill containing multiple charges for playing the LMAD game intermingled among charges for long distance phone calls. The LMAD charges appeared on pages marked with AT&T's name and logo. The remainder of the bill contained charges for local phone service owed to BellSouth, in which only BellSouth's name and logo appeared. Despite the separate sections for local and long distance charges, the entire portion of the bill was to be paid to BellSouth, which purchased AT&T's accounts receivable.

Upon noticing the LMAD charges, Kemp called the number for BellSouth listed in his phone bill, seeking information about these debts. After a BellSouth representative told Kemp that he owed the entire amount of the bill and would lose phone service if he refused to pay, Kemp paid for the charges and later brought

4

suit.[3]  At trial, the jury agreed with Kemp that AT&T's billing practices were fraudulent and constituted a pattern of racketeering activity within the meaning of the federal and Georgia RICO statutes.  In addition, the jury determined that AT&T's actions amounted to illegal gambling under state law and that the collection of these unlawful debts also violated RICO.  The jury awarded Kemp both compensatory damages and the aforementioned one million dollars in punitive damages.  AT&T moved for judgment as a matter of law and for a reduction of the punitive damages award.  The district court denied both motions and this appeal followed.

## II.  DISCUSSION

### A.  AT&T's Motion for Judgment as a Matter of Law

A motion for judgment as a matter of law should be granted only if a court finds that "there can be but one reasonable conclusion as to the proper judgment." See Bryan v. James E. Holmes Reg'l Med. Ctr., 33 F.3d 1318, 1333 (11th Cir. 1994) (internal quotation marks omitted).  AT&T argues that it was entitled to judgment as a matter of law because the jury's findings were unreasonable given the evidence presented at trial.  Specifically, AT&T claims that Kemp failed to

---

[3] Kemp also sued Teleline and USA Networks, which broadcast commercials for the LMAD line.  Both companies were dismissed from the lawsuit.

5

offer sufficient evidence for the jury to reasonably conclude that (1) AT&T's actions violated the mail or wire fraud statutes and Georgia's theft by deception statute; (2) AT&T's billing practices amounted to the collection of unlawful debts in violation of state and federal RICO; and (3) Kemp's payments were made involuntarily within the meaning of state law. We address each contention in turn.

### 1. RICO Violations For Racketeering Activity Involving Mail and Wire Fraud and Theft by Deception

In reviewing AT&T's motion for judgment as a matter of law on this issue, we consider whether there was a reasonable evidentiary basis for the jury to conclude that AT&T's actions constituted federal mail or wire fraud, under 18 U.S.C. §§ 1341 and 1343, respectively, and theft by deception under state law, Ga. Code Ann. § 16-8-3, which were the predicate crimes triggering RICO liability. See Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and the Georgia RICO Act, Ga. Code Ann. § 16-14-1 et seq. Given the materially equivalent elements for establishing a claim of mail or wire fraud and theft by deception, the district court only required that Kemp prove that AT&T committed mail and wire fraud. Since neither party challenges the correctness of this decision on appeal, we consider only whether Kemp established sufficient facts in order to prove mail or wire fraud. And because the elements of the mail

6

and wire fraud statutes are the same, we consider these claims together.  See

Pelletier v. Zweifel, 921 F.2d 1465, 1498 (11th Cir. 1991).

In order to bring a RICO claim where mail or wire fraud serves as the

predicate activity, it is necessary to show that (1) the defendant intentionally

participated in a scheme to defraud another of money or property, (2) the defendant

used the mails or wires in furtherance of that scheme, and (3) the plaintiff relied to

his detriment on the defendant's misrepresentations.  Id. at 1498-99.  Only intent

and reliance are at issue in this appeal, since AT&T obviously used the mails when

it sent Kemp his phone bill.

AT&T argues that Kemp failed to provide sufficient evidence that it

intended to deceive him because none of the statements in its long distance phone

bill were false.  As this court has explained, however, it is not necessary for a

plaintiff to point to affirmative misstatements in order to establish the requisite

fraudulent intent of a defendant under the mail and wire fraud statutes.  Langford v.

Rite Aid of Ala., Inc., 231 F.3d 1308, 1312 (11th Cir. 2000)  ("Intent to defraud

need not be shown through active misrepresentation – material omissions can be

fraudulent if they are intended to create a false impression.").  The nondisclosure

of material information, even in the absence of any patently false statements, can

also constitute a violation of the mail and wire fraud statutes where a defendant has

7

a duty to disclose.  See Ayres v. Gen. Motors Corp., 234 F.3d 514, 521 (11th Cir.

2000).  Such a duty can be judicially created where there is a special relationship of

trust between the parties, or may be based on other circumstances.  See Langford,

231 F.3d at 1312-13 ("Determinations as to whether a duty to disclose information

exists must be made on a case by case basis, with appropriate attention given to the

nature of the transaction and the relationship between the parties.").

In this case, once AT&T included the LMAD charges in the section of its

bill for long distance calls, it had the duty to correct the mistaken impression it had

fostered that the LMAD debts were for long distance charges.  See United States v.

Autuori, 212 F.3d 105, 119 (2nd Cir. 2000) ("A duty to disclose can also arise in a

situation where a defendant makes partial or ambiguous statements that require

further disclosure in order to avoid being misleading."); United States v. Townley,

665 F.2d 579, 585 (5th Cir. 1982) (noting that "under the mail fraud statute, it is

just as unlawful to speak 'half truths' or to omit to state facts necessary to make the

statements made, in light of the circumstances under which they were made, not

misleading").  The LMAD gambling charges appeared under the heading "direct

dialed calls" in Kemp's phone bill and were interspersed among charges for regular

long distance calls.  AT&T's name and logo were displayed on all the pages

containing the LMAD charges.  It was clearly foreseeable that this formatting

would cause some customers to think that the LMAD charges were for a long distance phone call owed to AT&T and that the charges had to be paid in order to maintain phone service.[4] In fact, however, the LMAD charges were not long distance charges but were gambling debts owed only to Teleline, and as AT&T acknowledged at trial, individuals could not lose phone service for failing to pay these debts. Moreover, as we explain below, the LMAD fees constituted illegal gambling debts that could not be collected lawfully under Georgia law.

In light of the circumstances here, and most specifically the way the charges were placed on the bill, we are satisfied that sufficient evidence supports the jury's conclusion that AT&T intended to mislead customers into believing that they had to pay the LMAD debts in order to maintain uninterrupted phone service. As a result, AT&T had a duty to place adequate information on its bill that would have disclosed the true nature of the LMAD charges and corrected the misconception it

---

[4] The possibility that individuals would be misled by AT&T's billing practices motivated a group of state attorneys general to petition the company to segregate 900-numbers from regular long distance charges. The group also asked AT&T to identify the name and address of the creditor to whom the charge was owed, and to inform consumers that they could dispute the 900-number charges and that their telephone service could not be disconnected for failing to pay these debts. AT&T declined, explaining that such changes would "likely encourage unjustified non-payment and generate great increases in uncollectible amounts." Therefore, AT&T was clearly aware that its customers would be far less likely to pay the LMAD charges if they were informed about the true nature of the debts.

9

had intentionally created.[5]  See Autuori, 212 F.3d at 119.

Because AT&T was under a duty to make this disclosure, the company cannot argue that Kemp failed to rely on AT&T's omissions.  Although it was a BellSouth representative who erroneously stated that Kemp's service would be terminated if he did not pay for the LMAD charges, had AT&T's long distance bill contained the necessary disclosures, Kemp need not have called BellSouth for an explanation.  AT&T's material omissions were thus an essential part of Kemp's decision to pay these gambling debts.  The district court did not err in denying AT&T's motion for judgment as a matter of law with respect to the jury's finding of fraud.  See EEOC v. W&O, Inc., 213 F.3d 600, 610 (11th Cir. 2000) (judgment as a matter of law should be denied unless the evidence "is so one-sided that one party must prevail as a matter of law").

### 2.  *Illegal Gambling and Collection of an Unlawful Debt*

AT&T argues that the district court erred when it concluded that the LMAD

---

[5] Although no such statutory duty existed at the time the calls in this case were made, under current federal law, AT&T must explain to its customers that the failure to pay 900-number charges will not result in the loss of long distance service.  According to federal regulations, a common carrier, such as AT&T, must provide directly, or "through contract with any local exchange carrier providing billing and collection services," a disclosure statement indicating that a common carrier does not have the right to "disconnect or interrupt in any manner, or order the disconnection or interruption of, a telephone subscriber's local exchange or long distance telephone service as a result of that subscriber's failure to pay" a 900-number charge.  See 47 C.F.R. §§ 64.1507(a) and 64.1509(b)(2).

game violated Georgia's prohibition on illegal gambling. As a result, the company maintains that the jury's finding that it collected unlawful debts in violation of the federal and Georgia RICO statutes should be reversed, since both RICO claims are founded on a violation of Georgia's ban on gambling. See 18 U.S.C. § 1961(6) ("unlawful debt" under federal RICO statute includes debts incurred in activities that violate state gambling laws) and Ga. Code Ann. § 16-14-3(9)(A)(xvii) (racketeering activity under Georgia RICO includes violations of state prohibition on commercial gambling).

Under state law, the LMAD game was an illegal lottery if it was a "scheme or procedure whereby one or more prizes are distributed by chance among persons who have paid or promised consideration for a chance to win such prize." Ga. Code Ann. § 16-12-20(4). This definition incorporates three key elements: consideration, prize and chance. See Tierce v. State, 122 Ga. App. 845, 846 (Ga. Ct. App. 1970). Kemp maintains that all three elements were satisfied by showing that his grandson called a number that offered a chance to win a prize in exchange for a fee. AT&T responds that because non-callers could also participate in the game through the mail, the element of consideration was negated.

As the Georgia Court of Appeals has explained, in order for a game to amount to illegal gambling, it is only necessary that "among those persons who

11

receive a chance to win a prize there must be some who have paid a consideration."

Id. at 847; see also Barker v. State, 193 S.E. 605, 607 (Ga. Ct. App. 1937) ("The

test is not whether it was possible to win without paying. . . . The test is whether

that group who did pay . . . were paying in part for the chance of a prize.") (internal

quotation marks omitted). Clearly, the element of consideration was present for

those callers who called the line, since they were charged $3.88 per minute to play

and have the chance of winning a prize. Therefore, LMAD was an illegal lottery

under Georgia law and the district court did not err in rejecting AT&T's motion for

judgment as a matter of law.[6]

### 3. *Whether Georgia's Voluntary Payment Statute Bars Kemp's Recovery*

Georgia's voluntary payment statute, which AT&T claims bars Kemp's

recovery, provides that:

> Payments of claims made through ignorance of the law or where all
> the facts are known and there is <u>no misplaced confidence and no
> artifice, deception, or fraudulent practice</u> used by the other party are

---

[6] On appeal, AT&T also argues that even if it violated Georgia's ban on gambling, Kemp cannot recover because state law bars the enforcement of an illegal gambling contract. Under Georgia law, illegal gambling contracts are not enforced, but are instead rescinded. This means that although an individual cannot sue to collect his winnings, he can sue to get his money back. See Roney v. Crawford, 68 S.E. 701, 702 (Ga. 1910). Kemp obviously is suing to recover losses he suffered, not to collect any prize offered by LMAD. Georgia law does not bar his receipt of damages. We also disagree with AT&T's position that it was not in the business of gambling within the meaning of the federal RICO statute. See 18 U.S.C. § 1961(6)(B). During its relationship with Teleline, AT&T collected $287,360.59 from Georgia residents who called LMAD. Clearly, billing for LMAD calls was a regular part of AT&T's business operations.

12

deemed voluntary and cannot be recovered unless made under an urgent and immediate necessity therefor or to release person or property from detention or to prevent an immediate seizure of person or property. Filing a protest at the time of payment does not change the rule prescribed in this Code section.

Ga. Code Ann. § 13-1-13 (emphasis added).

Under section 13-1-13, a payment will not be deemed voluntary if it was the product of fraud. See Decatur Fed. Sav. & Loan v. Gibson, 268 Ga. 362, 363 (Ga. 1997). Therefore, in light of the jury's finding of fraud, we conclude that Kemp's payment was not made voluntarily under Georgia law.

## B. AT&T's Motion for Remittitur of the Punitive Damages Award

Given the jury's findings that AT&T acted fraudulently and knowingly collected gambling debts, there was sufficient evidence to justify an imposition of some amount of exemplary damages under state law.[7] However, the fact that some amount of exemplary damages was warranted in this case does not end our inquiry. The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a defendant and creates substantive limits on the amount of punitive damages a state may impose. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416 (2003). In determining whether the

---

[7] Under Ga. Code Ann. § 51-12-5.1(b), "punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences."

13

jury's award crosses this substantive line and is constitutionally excessive, we are required by the Supreme Court to consider three guideposts: (1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. Id. at 418.

We review the constitutionality of the jury's punitive damages award de novo. Cooper Indus., Inc., v. Leatherman Tool Group, Inc., 532 U.S. 424, 436 (2001).

### 1. Reprehensibility Analysis

The reprehensibility of a defendant's conduct is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." BMW of N. Am., Inc., v. Gore, 517 U.S. 559, 575 (1996). In conducting this reprehensibility analysis, the Supreme Court has articulated several factors for a court to consider. These factors include: (1) whether the injury caused physical harm; (2) whether the tortious conduct demonstrated an indifference to, or a reckless disregard of, the health or safety of others; (3) whether the target was financially vulnerable; (4) whether the conduct involved repeated actions; and (5) whether the harm was the result of intentional malice, trickery, or deceit.

14

Campbell, 538 U.S. at 419.

The district court found that the first two factors did not apply in this case, while the remaining three were met. We agree with the district court that AT&T's conduct was deceitful and involved repeated actions. We think the trial court was also justified in finding that AT&T intended to target financially vulnerable individuals given the jury's finding of fraud. AT&T's efforts to misleadingly represent gambling debts, which were illegal under Georgia law, as legitimate charges for long distance calls could be deemed by a jury to be designed to exploit customers who were unsophisticated and economically vulnerable.

Furthermore, like the trial court, we find little evidence that AT&T made a genuine attempt to shutdown the LMAD line before the events in this case transpired. It was not until AT&T was sued that it revised its 900-number guidelines in April 1992 to prohibit gambling lines for which it provided collection services from advertising or operating in Georgia. Despite the guidelines, Teleline continued to advertise and operate the LMAD game in Georgia for another five months. It was not until September 1992 – after the calls at issue in this case had been made – that Teleline sought to block calls from Georgia residents to LMAD. However, as the district court noted in its order, at the time AT&T instructed Teleline to stop accepting calls from Georgia, Teleline lacked the necessary

15

technology to block calls on AT&T's network. Furthermore, although AT&T told LMAD to stop advertising in Georgia, the company knew that Teleline relied on national advertisements on television that were broadcast within Georgia.

Based on the above, we find sufficient evidence for the district court's legal characterization of AT&T's conduct. AT&T collected $287,360.59 in illegal gambling debts for calls placed to the LMAD line. This sort of large-scale corporate malfeasance clearly merited a substantial penalty.

### 2. Ratio Between Compensatory and Punitive Damages

Although the Supreme Court has resisted establishing a specific ratio beyond which a damage award will violate the Constitution, in practice "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." Id. at 425. Obviously, this single-digit multiplier was exceeded in this case to a considerable extent. However, as the Supreme Court has explained, in some situations a higher ratio may be appropriate where a "particularly egregious act has resulted in only a small amount of economic damages." Id. (internal quotation marks omitted). Given the small amount of economic damages in this case, the district court believed that AT&T's conduct fell within this exception, since the company's conduct was deceitful, involved repeated illegal acts, and targeted the financially vulnerable.

16

We agree with the district court that a mechanical application of the Supreme Court's single-digit multiplier formula would not adequately take account of the seriousness of AT&T's misconduct.  In Johansen v. Combustion Engineering, Inc., 170 F.3d 1320 (11th Cir. 1999), we upheld a punitive award of $4.35 million dollars, which was around 100 times the amount of actual damages awarded by the jury, because this amount was "justified by the need to deter this and other large organizations from a 'pollute and pay' environmental policy."  170 F.3d at 1339.[8]  We noted that the defendant in Johansen was "a large and extremely wealthy international corporation" and that sometimes a "bigger award is needed to attract the . . . attention of a large corporation" in order to promote deterrence effectively.  Id. at 1338 (internal quotation marks omitted).  We later explained that the result in Johansen was motivated by the recognition that "the combination of a small damages award and a strong state interest in deterrence of a particular wrongful act may justify 'ratios higher than might otherwise be acceptable.'"  W&O, Inc., 213 F.3d at 616 (quoting Johansen, 170 F.3d at 1338)).

Like the state interest at issue in Johansen, Georgia's interest in deterring fraud and illegal gambling also justifies a ratio "higher than might otherwise be

[8] The aggregate amount of compensatory damages awarded in Johansen was $47,000. 170 F.3d at 1326. Obviously, the actual damages in this care are far lower, indicating that a ratio greater than 100-to-1 may be appropriate.

17

acceptable." Johansen, 170 F.3d at 1338. Reducing the jury's award to an amount not significantly larger than nine times the actual damages awarded in this case would mean that AT&T would receive a sanction of little more than a thousand dollars. Such an amount, levied against a company as large as AT&T, would utterly fail to serve the traditional purposes underlying an award of punitive damages, which are to punish and deter. See Gore, 517 U.S. at 568 ("Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition."). Therefore, we agree with the district court that this case falls within the exception articulated in Gore.

### 3. Civil and Criminal Sanctions for Similar Conduct

The third factor, which is accorded less weight in the reasonableness analysis than the first two guideposts, involves a comparison between "the punitive damages award and the 'civil penalties authorized or imposed in comparable cases.'" Campbell, 538 U.S. at 428.

The district court did not compare the jury's award to any civil judgments for violations of RICO where unlawful gambling has served as the predicate act. It stated that "[n]o civil cases involving punitive damages, analyzed under the Gore framework could be located for comparison." Dist. Ct. Order at *43. Given this lacuna, the trial court relied entirely on comparisons between the jury award and

18

criminal sanctions for violating RICO.  In <u>Campbell</u>, the Supreme Court stated that while it is true that "[t]he existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action," when comparisons to criminal penalties are "used to determine the dollar amount of the award, however, the criminal penalty has less utility."  538 U.S. at 428.  The <u>Campbell</u> Court noted that "[g]reat care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed."  <u>Id</u>.  Therefore, we are careful to avoid placing too much reliance on the size of criminal penalties in assessing the reasonableness of the jury's award.

### 4. Conclusion

We believe the facts of this case clearly support a very significant award. AT&T engaged in what amounted to an illegal gambling scheme in the state of Georgia.  Without AT&T's decision to participate, the operation could never have succeeded.  This fact was forcefully expressed by the president of Teleline, Mr. Lorsch, who testified that:

> [I]f you couldn't bill or you couldn't collect, there would be no reason
> to operate the program or have the program.  It was – the fact that
> AT&T would offer billing and collection [that] was the inducement to
> be in the business.  I mean you had the biggest company in the world
> putting their name on a piece of paper that says, "This is a good

19

program, pay for it."

Given AT&T's critical role in the operation of the LMAD line, the company deserved to pay a serious penalty for its misconduct.   In addition, the punitive award needed to be large enough to deter AT&T's misconduct.  See W&O, Inc., 213 F.3d at 616-17 (noting that "wealth and size of the defendant" could be considered in determining whether the punitive damages award was reasonable) (internal quotation marks and citation omitted).[9]  A punitive award that was not much larger than nine times the amount of actual damages, or approximately a thousand dollars, would not effectively punish AT&T for its conduct or serve any deterrent value whatsoever.  Clearly, the Supreme Court, in erecting a "guidepost" that requires considering the ratio of punitive to actual damages, did not intend to prevent juries from levying awards that serve important state interests and provide a meaningful deterrent against corporate misconduct.  At the same time, we recognize that one million dollars, in relationship to the amount of harm that occurred in this case, is constitutionally excessive.  Although there is no algorithm that yields a precise figure, we are persuaded that an award that was less than

_____

[9]  This does not mean, however, that the wealth of a defendant can justify an otherwise unconstitutional punitive damages award.  See Campbell, 538 U.S. at 427.  For example, while the wealth of a defendant is a legitimate consideration in determining the reasonableness of the jury's award, it cannot be the sole basis for a large punitive award in the absence of any of the "guideposts" articulated by the Supreme Court, such as the reprehensibility of a defendant's conduct.  See Gore, 517 U.S. at 591 (Breyer, J., concurring).

$250,000 would not serve a meaningful deterrent to a corporation like AT&T.  An award greater than this amount, however, would prove an unconstitutional windfall.

We therefore affirm the district court's denial of AT&T's motion for judgment as a matter of law, but reverse the trial court's denial of AT&T's motion to reduce the punitive award, remanding with directions to the trial court to reduce the punitive damages award to $250,000.

AFFIRMED IN PART,  REVERSED IN PART, AND REMANDED.