Frank KRYSA, et ux., Respondents,

v.

Emmett PAYNE, et ux., Appellants.

No. WD 64589.

Missouri Court of Appeals,
Western District.

Nov. 15, 2005.

John Robert Loss, Kansas City, MO, for appellants.

Bernard E. Brown, Kansas City, MO, for respondents.

Before ROBERT G. ULRICH, Presiding Judge, JOSEPH M. ELLIS, Judge and THOMAS H. NEWTON, Judge.

JOSEPH M. ELLIS, Judge.

Appellants Emmett and Terri Payne appeal from a judgment entered against them in favor of Respondents Frank and Shelly Krysa on Respondents' claims of fraudulent nondisclosure and fraudulent misrepresentation arising from Appellants' sale of a used truck to Respondents. The jury awarded Respondents $18,449.53 in actual damages and $500,000 in punitive damages. For the following reasons, we affirm the judgment.

In November 2000, Respondents were shopping for a truck to pull their 28–foot trailer. During the course of their search, they visited Payne's Car Company, a used car dealership owned and operated by Appellants. Appellants' salesperson, Kemp Crane, showed Respondents around the car lot. Respondents informed Crane that they were looking for a dependable truck that had room for their whole family and that could tow at least 8,000 pounds. Respondents did not find anything that interested them on the lot that day.

A few weeks later, Crane called Respondents and told them that he had a truck on the lot that he thought might meet their needs. Respondents went to the lot to look at that truck. While Respondents were not interested in the truck that Crane had called about, they noticed a 1991 Ford F–350 diesel, extended-cab truck running at the back of the lot that interested them. When asked why the engine was running, Crane told the Respondents that the battery was being charged. Crane told the Respondents that the truck was in perfect shape and that it would have no problem pulling an 8,000–pound load. Crane informed the Respondents that the truck would make it to 400,000 miles if they took care of it. Respondents took the truck on a test drive, but did not take it out on the highway. It seemed to drive fine on the test drive. Upon opening the hood, Mr. Krysa noticed that the hood was a different color than the rest of the truck. Crane said the different color was due to the fact that the truck had recently been repainted. Crane informed the Respondents that the truck was in their price range and would cost $9,900. He offered Respondents $1,500 for their trade-in.

The following day, Mr. Krysa went to the dealership and put down a deposit on the truck. The Respondents subsequently arranged for a loan from their credit union and borrowed an additional $1,400 from Mr. Krysa's mother to purchase the truck.

On November 17, the Respondents returned to finalize their purchase of the truck. When they arrived, the engine on the truck was again running. Crane informed them that they had put some fuel in the truck and then left it running so that it would be warm for the Respondents because it was cold out that day. Crane also informed the Respondents that they had replaced the steering column because it had "frozen up". When Mrs. Krysa asked Crane where the truck had come from, Crane told her that it was "a one-owner trade-in from McCarthy." Respondents then paid for the truck and took possession of it, but the title to the truck was not provided to them at that time.

Later that day, Respondents noticed that the power locks did not work on the vehicle. A few days later, Mr. Krysa drove the truck to work, but it took him approximately three hours to get it started at the end of the day. Mr. Krysa also noticed that the heater was not working right.

Mr. Krysa bought a book about the truck and tried to fix the problems by disconnecting the power locking function and replacing the fuel pump. In the process of replacing the fuel pump, he noticed that the radiator was smashed up, the radiator cap did not have a seal, and the thermostat was missing. Mr. Krysa also noticed broken glass on the floor underneath the front seats and that the driver's side window had been replaced.

Shortly thereafter, Mr. Krysa attempted to tow his trailer from the lake back to their house. Within the first two miles, he had his foot almost to the floor trying to get the truck to pull the trailer and a large amount of smoke was pouring out of the back of the truck. Mr. Krysa had to turn around and return the trailer to the lake.

Mr. Krysa also noticed that the truck was consuming a lot of oil, requiring four quarts in the first 120 miles he drove it. In addition, the oil pressure decreased every time the gas pedal was depressed instead of increasing.

Mr. Krysa's brother-in-law suggested that Respondents obtain a "CARFAX" report for the truck. Upon obtaining that report, Respondents discovered that the truck had thirteen prior owners.

After receiving the CARFAX report, Mr. Krysa went back to the dealership to discuss the truck's problems and the CARFAX report with Mr. Payne. Upon examining the radiator, Mr. Payne stated that "it looked like it had been sabotaged to be sold." When Mr. Payne went for a ride in the truck with Mr. Krysa, the truck lacked power, spewed smoke, and the oil pressure decreased when the gas pedal was depressed. Mr. Payne acknowledged that the truck appeared to have been involved in a wreck. Mr. Payne told Mr. Krysa that he would allow Respondents to return the truck and credit the purchase price toward the purchase of one of his other vehicles, but would not return their money to them. Respondents lacked the means to pay much more than the $9,900 they had paid for the F–350 and were unable to find any vehicle on the lot that met their needs that did not cost substantially more than that.

Subsequently, Respondents had the vehicle inspected by an automotive expert, Richard Diklich, who quickly discovered that the truck was actually two vehicles that had been welded together. Diklich advised Respondents to avoid driving the vehicle because of safety concerns. Additional facts will be discussed *infra*, as needed.

On February 1, 2001, Respondents filed a petition against Appellants in the Circuit Court of Jackson County asserting claims of fraudulent nondisclosure, fraudulent

misrepresentation, violation of the Missouri Merchandising Practices Act, breach of the implied warranty of merchantability, and breach of the implied warranty of fitness for a particular purpose. The case was tried from May 10 to 14, 2004. The jury returned verdicts for Respondents on all of their claims. The jury awarded Respondents $18,449.53 in compensatory damages and $500,000 in punitive damages, and the trial court entered judgment against Appellants in that amount. Appellants bring three points on appeal.

In their first point, Appellants claim the trial court erred in denying their motion for new trial or, in the alternative, for remittitur because the award of $500,000 in punitive damages was so excessive as to violate their right to due process.[1] Appellants contend that the amount of punitive damages awarded "bore no logical relation to the alleged actual harm and was the product of improper motives or a clear absence of the exercise of honest judgment by the jury."

"The assessment of damages is primarily a function for the jury." *McCormack v. Capital Elec. Constr. Co.*, 159 S.W.3d 387, 395 (Mo.App. W.D.2004). Once the jury has assessed damages, however, "[t]he trial court has broad discretion in ordering remittitur." *Coggins v. Laclede Gas Co.*, 37 S.W.3d 335, 342 (Mo.App. E.D.2000). This Court must ordinarily "defer to the jury's and the trial judge's determination of damages because they are in much better positions than the appellate court to assess the credibility of damage witnesses and to determine the appropriate compensation." *Foster v. Catalina Indus., Inc.*, 55 S.W.3d 385, 392 (Mo.App. S.D.2001). Accordingly, "[t]he

appellate court should exercise its power to interfere with the judgment of the jury and trial court with hesitation and only when the verdict is manifestly unjust." *McCormack*, 159 S.W.3d at 395.

In this case, however, Appellants challenge the punitive damages awarded as being constitutionally excessive. Punitive damages differ from compensatory damages in that "[c]ompensatory damages 'are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct,' " *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416, 123 S.Ct. 1513, 1519, 155 L.Ed.2d 585 (2003), while "[t]he well-established purpose of punitive damages is to inflict punishment and to serve as an example and a deterrent to similar conduct." *Call v. Heard*, 925 S.W.2d 840, 849 (Mo. banc 1996).

The decision to punish a tortfeasor through an award of punitive damages " 'is an exercise of state power that must comply with the Due Process Clause of the Fourteenth Amendment.' " *Letz v. Turbomeca Engine Corp.*, 975 S.W.2d 155, 177 (Mo.App. W.D. banc 1997) (quoting *Honda Motor Co. v. Oberg*, 512 U.S. 415, 434, 114 S.Ct. 2331, 2342, 129 L.Ed.2d 336 (1994)). As noted by this Court in *Letz*:

The constitutional concerns are both procedural and substantive. Procedurally, the "traditional common law approach," which includes proper jury instruction and review of a jury award by the trial court and an appellate court, generally satisfies due process. Substantively, when an award can fairly be categorized as "grossly excessive" in relation to the interests of punishment and

---

1. While Missouri case law also allows for a trial court's decision not to remit a punitive award to be reviewed for reasonableness under an abuse of discretion standard, Appel-

lants have not made such a challenge in this appeal. *See Barnett v. La Societe Anonyme Turbomeca France*, 963 S.W.2d 639, 662 (Mo. App. W.D. banc 1997).

deterrence, it penetrates the "zone of arbitrariness" that violates the Due Process Clause of the Fourteenth Amendment.

*Id.* at 177 (internal citations omitted). In this appeal, Appellants make no procedural due process claim but rather contend that the verdict was so grossly excessive as to violate their substantive right to Due Process.

"The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *Campbell,* 538 U.S. at 416, 123 S.Ct. at 1519–20. "To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Id.* 538 U.S. at 417, 123 S.Ct. at 1520.

With regard to whether a punitive award is grossly excessive, "the relevant constitutional line is 'inherently imprecise,' rather than one 'marked by a simple mathematical formula.'" *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.,* 532 U.S. 424, 434–35, 121 S.Ct. 1678, 1684, 149 L.Ed.2d 674 (2001) (internal citations omitted). " '[T]he amount of punitive damages should reflect the enormity of the defendant's offense and be related to actual or potential harm resulting therefrom.'" *Henderson v. Fields,* 68 S.W.3d 455, 486–87 (Mo.App. W.D.2001) (quoting *Letz,* 975 S.W.2d at 177). In determining whether the amount of a punitive award has crossed the line and is unconstitutionally excessive, the United States Supreme Court has "instructed courts evaluating a punitive damages award's consistency with due process to consider three criteria: (1) the degree of reprehensibility of the defendant's misconduct, (2) the disparity between the harm (or potential harm) suffered by the plaintiff and the punitive damages award, and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Cooper Indus., Inc.,* 532 U.S. at 440, 121 S.Ct. at 1687 (citing *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 574–75, 116 S.Ct. 1589, 1598–99, 134 L.Ed.2d 809 (1996)); *see also Werremeyer v. K.C. Auto Salvage Co.,* 134 S.W.3d 633, 635 (Mo. banc 2004).

In this case, after considering Appellants' due process excessiveness claim, the trial court denied their motion for remittitur, implicitly finding that the verdict was not so grossly excessive as to violate their right to due process. While we must defer to the findings of fact made by the trial court, the question of whether the amount of the punitive award falls within constitutional limits under the facts of the case, as found by the trial court, calls for the application of constitutional standards to the facts of the case. *Cooper Indus., Inc.,* 532 U.S. at 435, 121 S.Ct. at 1685 (internal citations omitted). Therefore, this Court must review the trial court's determination of the constitutionality of the punitive award *de novo,* deferring to the trial court's findings of fact, unless they are clearly erroneous.[2] *Id.* 532 U.S. at 436, 440 n. 14, 121 S.Ct. at 1685–86, 1688 n. 14 (internal citations omitted).

We first consider the reprehensibility of Appellants' actions. This factor "is considered 'the most important indicium' of the reasonableness of a punitive damages award." *Weaver v. African Methodist Episcopal Church, Inc.,* 54 S.W.3d 575, 589 (Mo.App. W.D.2001) (quot-

---

2. If no constitutional challenge is raised, the role of the appellate court is to review the reasonableness of the award under an abuse of discretion standard. *Cooper Indus., Inc. v.* *Leatherman Tool Group, Inc.,* 532 U.S. 424, 433, 121 S.Ct. 1678, 1684, 149 L.Ed.2d 674 (2001).

ing *Gore,* 517 U.S. at 575, 116 S.Ct. at 1599). The U.S. Supreme Court has directed courts to determine the reprehensibility of a defendant's conduct by considering whether:

the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Campbell,* 538 U.S. at 419, 123 S.Ct. at 1521. In evaluating the reprehensibility of Appellants' actions, we defer to the factual findings of the jury and the trial court and "are 'limited to a consideration of the evidence which supports the verdict excluding that which disaffirms it.'" *Coggins,* 37 S.W.3d at 343 (quoting *Botanicals on the Park, Inc. v. Microcode Corp.,* 7 S.W.3d 465, 470 (Mo.App. E.D.1999)); *see also Cooper Indus., Inc.,* 532 U.S. at 440 n. 14, 121 S.Ct. at 1687–88 n. 14. In other words, we view the evidence and all reasonable inferences in the light most favorable to the verdict and disregard all contrary evidence and inferences.

While the damage actually sustained by Respondents was relatively small and was economic in nature, the record clearly supports a finding that Appellants acted indifferently to or in reckless disregard of the safety of Respondents in selling them a vehicle that they knew or should have known was not safe to drive and that the potential harm to the Respondents was much greater than the harm that was actually incurred.

Mr. Payne testified that he had about thirty years of experience in the car industry and had inspected more vehicles than he could count. He said that he was ac-customed to inspecting vehicles to look for signs of possible previous damage. Mr. Payne stated that he had performed a "walk-around inspection" of the vehicle where he looked for obvious signs of body damage, checked the tires, checked the paint, and looked for broken glass, but that the only problem that he saw with the truck was that it had a bunch of chips or pits in the paint on the right side. He admitted being aware that the underside of the hood was a different color than the rest of the truck, indicating that the hood had previously been replaced, and acknowledged that one of the things that would suggest wreck damage to a vehicle was if the hood had been replaced. Mr. Payne said that he could have had the truck put up on a lift for additional inspection or had someone else inspect it for damage but stated that he had not done so. He testified that he had $1,100 in paint and bodywork performed on the car by Maaco Painting. When questioned about what was contained on the bill from Maaco Painting, Mr. Payne confessed that, in addition to repainting the truck, Maaco Painting also had repaired the left and right rear fenders, straightened the left bed of the truck, and straightened the right cab. He then stated that he could not remember what was wrong with the truck that prompted the listed repairs.

In contrast, Respondents' automotive expert, Richard Diklich, testified that it would have been obvious to a person knowledgeable about inspecting automobiles, as Mr. Payne claimed to be, that the truck had been previously wrecked or had something major happen to it after conducting a brief visual inspection of the vehicle. Diklich stated that he noticed the hood had apparently been replaced, as it was red underneath and the core support was painted white, while the rest of the truck was brown. He further stated that

he noticed fender washers on the hood latch and "a pretty good-sized area of weld repair on a bracket under the hood back at the right side." Diklich testified that he observed a wide gap around the windshield molding on the left side that could be seen from fifteen feet away and was asymmetrical with the right side. He indicated that, upon looking inside the cab to see why the gap existed, he almost immediately found that the truck had been sectioned across the A-pillars on both sides and re-welded. Diklich stated that it was rare for just those pillars to be cut, so he looked underneath the vehicle and saw a butt-welded seam all the way across the floor pan. He testified that the welding was clearly a repair job and was poorly done, with wire whiskers sticking out, poor corrosion proofing, burn-through, and some holes. This observation led him to immediately conclude that the front end of the truck had been grafted onto the back end of another truck. Diklich stated that he also found that the VIN plate on the dashboard had been rewelded in place. He also found that one of the four big bolts and nuts that hold the cab down was missing.

Diklich also testified that the repairs that had been made to the vehicle did not approach industry standards for repair and posed significant safety risks to occupants of the vehicle in the event of an accident. He stated that, in the event of a collision, there was a risk of the windshield becoming detached and that an even bigger concern was the truck's ability to withstand a roll-over crash or something like a tree limb landing on the roof. Diklich had advised Mr. Krysa to avoid driving the vehicle because of these safety concerns.

In addition, Mr. Payne admitted that a dealer is required to disclose that a vehicle has been rebuilt if he is aware of that fact. Appellants' salesperson, Crane, testified that it was very important to know if a vehicle had frame or structural damage and that that fact be disclosed to potential buyers if the salesperson is aware of it. And Diklich added that the sale of rebuilt wrecked cars without disclosure was a significant problem in the used car industry.

While Mr. Payne claimed not to have had any idea that the vehicle had any non-cosmetic problems, the jury was not required to believe him and clearly found that his testimony was not credible.[3] The record more than sufficiently supports an inference that Mr. Payne was aware that the truck had significant structural and mechanical problems or that he recklessly disregarded obvious signs of such problems. Such behavior was particularly reprehensible in light of the potential danger to the safety of his customers. *See Parrott v. Carr Chevrolet, Inc.*, 331 Or. 537, 17 P.3d 473, 488 (2001) ("[D]efendant's failure to disclose that the [used vehicle] previously had been damaged also implicated its overall safety and evinced an indifference

---

3. Indeed, before awarding punitive damages in Missouri, a jury must find that the Plaintiff has made a "showing, by clear and convincing proof, of a culpable mental state on the part of the defendant, either by a wanton, willful or outrageous act, or reckless disregard for an act's consequences (from which evil motive is inferred)." *Werremeyer v. K.C. Auto Salvage Co.*, 134 S.W.3d 633, 635 (Mo. banc 2004). The jury was instructed that it could determine that punitive damages were appropriate if they found that "the conduct of Payne's Car Company was outrageous because of Payne's Car Company's evil motive or reckless indifference to the rights of others." Thus, in determining that a punitive damages award was appropriate, the jury necessarily found that Appellants actions were prompted by evil motive or a reckless indifference. Appellants do not challenge the jury's determination that punitive damages were appropriate on appeal and merely focus on whether the amount of the punitive damages award violated their right to due process.

not only to plaintiff's health and safety, but also to the health and safety of the general public that would share the road with a potentially unsafe vehicle."). Thus, while Appellants' motives may have been economic in nature and the damages actually sustained by Respondents were likewise economic in nature, Appellants' conduct evinced an indifference to or a reckless disregard of the health and safety of others.

 Moreover, the record also supports a finding that this was not an isolated incident and was part of a larger pattern of behavior on the part of Appellants. The United States Supreme Court has recognized that " 'repeated misconduct is more reprehensible than an individual instance of malfeasance,' " and, therefore, " 'a recidivist may be punished more severely than a first offender.' " *Campbell,* 538 U.S. at 423, 123 S.Ct. at 1523 (quoting *Gore,* 517 U.S. at 577, 116 S.Ct. at 1599–1600). Evidence that a defendant has "repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful" provides "relevant support for an argument that strong medicine is required to cure the defendant's disrespect for the law." *Gore,* 517 U.S. at 576–77, 116 S.Ct. at 1599.

Mr. Payne testified that his sale of the truck to the Krysas was consistent with the standard practices of his dealership. He subsequently admitted having previously purchased numerous vehicles with express disclosures that they had frame damage, body damage, and/or unibody damage and resold them without providing the buyer with any disclosure of the previous damage. He indicated that this was his standard practice if he did not feel like the damage was substantial based upon his visual inspection of the vehicle. Counsel questioned Mr. Payne about several specific vehicles that he had purchased at auction with disclosures of unibody and structural damage and then resold at a substantial profit without any disclosure of the damage to the purchaser. In each instance, Mr. Payne stated that he did not feel any disclosure was necessary because he did not see any signs of significant problems when he visually inspected the vehicle. Thus, the jury could reasonably have determined that Appellants had a pattern of disregarding warnings of structural damage to vehicles where such damage was not obvious.

The evidence also supported a finding that the harm sustained by Respondents was the result of intentional malice, trickery, or deceit, and was not merely an accident. Mr. Payne had a significant amount of work done to the vehicle to make it appear to be in good shape. This included, among numerous other repairs, straightening both the bed and cab of the truck. Appellants' salesman, Kemp Crane, lied to Appellants on several occasions about the condition of the truck, its origin, and its capabilities. This evidence, in addition to other evidence previously described, sufficiently established that Appellants affirmatively misrepresented the condition of the F–350 to Respondents in an attempt to trick them into buying the vehicle.

 Finally, we note that Respondents were financially vulnerable. The purchase price of the truck was at the upper limit of what they were able to afford. After discovering the safety problems posed by the truck and because Appellants refused to refund their purchase price, Respondents were unable to obtain another vehicle for their use, leaving them with only one safe vehicle for their family. They were forced to either risk driving the truck with its safety problems, to borrow various vehicles from friends and family, or to alter their schedules to drive each other around.

"[I]nfliction of economic injury, especially when done intentionally through affirmative acts of misconduct or when the target is financially vulnerable, can warrant a substantial penalty." *Gore,* 517 U.S. at 576, 116 S.Ct. at 1599 (internal citation omitted).

In sum, while the harm actually sustained by Respondents in this case was economic as opposed to physical, Appellants' conduct did pose a significant risk to the physical welfare of Respondents and evinced an indifference to or reckless disregard of the health or safety of Respondents and the general public as well. Furthermore, the conduct was consistent with Appellants' regular business practices and was not an isolated incident, involved acts of intentional trickery and deceit, and targeted victims that were financially vulnerable. Thus, in society's eyes, viewing the totality of the circumstances, Appellants' conduct can only be seen as exhibiting a very high degree of reprehensibility.

█ We next examine the second indicium of an excessive punitive award: the ratio of the punitive award to the actual or potential harm to the plaintiff. *Barnett v. La Societe Anonyme Turbomeca France,* 963 S.W.2d 639, 666 (Mo.App. W.D.1997). The United States Supreme Court has "been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award," but has noted that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Campbell,* 538 U.S. at 424–25, 123 S.Ct. at 1524. The Supreme Court has specifically noted, however, that "low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages." *Gore,* 517 U.S. at 582, 116 S.Ct. at 1602; *see also Campbell,* 538 U.S. at 425, 123 S.Ct. at 1524; *Letz,* 975 S.W.2d at 179.

Appellants contend that the ratio between the actual damages awarded, $18,449.53, and the punitive award, $500,000, is grossly excessive, in that the ratio of punitive to actual damages is approximately 27:1.

The initial problem with Appellants' argument is that it fails to consider the evidence of the potential harm that could have been sustained by the Respondents. As noted *supra,* the proper consideration is "the disparity between the harm *or potential harm* suffered by the plaintiff and the punitive damages award." *Cooper Indus., Inc.,* 532 U.S. at 440, 121 S.Ct. at 1687 (emphasis added and parentheses omitted). The record contains evidence that the condition of the truck posed a significant safety risk. Thus, the potential harm to Respondents was certainly greater than the economic damages they actually sustained.

The other major weakness in Appellants' argument is the fact that the amount of actual damages awarded was relatively small. *See Letz,* 975 S.W.2d at 179 (noting that an award of $19,000 in actual damages was "relatively small"). As noted *supra,* higher ratios are more likely to be constitutionally permissible where the amount of actual damages is small and the actions of the defendants are particularly egregious. Both of these elements are satisfied in this case.

We also note that, in their testimony, Appellants expressed their unwillingness to alter their business practices. Mr. Payne testified that the only change he would be making to how the dealership conducted business was to get CARFAX reports for all of the vehicles they sold and

that their only reason for doing so was to protect themselves. This is consistent with the fact that Appellants had failed to alter their business practices after being involved in the losing end of two prior lawsuits involving similar car sales, one of which resulted in a verdict against Mr. Payne for $170,000. Accordingly, it was reasonable for the jury to conclude that a significantly larger award would be necessary to deter Appellants from similar behavior in the future.

This case in not unlike *Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024 (8th Cir.2000), a used car sale case wherein the Eighth Circuit affirmed a collective punitive to collective actual ratio of 27:1. In *Grabinski*, the salesperson told the plaintiff that the vehicle ran perfectly, had one previous owner, and had never been wrecked.[4] Mechanical problems soon arose with the vehicle, and the plaintiff investigated the vehicle's history and discovered that it had been wrecked, rebuilt, and had more than one previous owner. At trial, the plaintiff's expert testified that the vehicle had signs of wreck damage that should have been obvious to a vehicle appraiser on visual examination. The jury awarded the plaintiff a total of $7,835 in actual damages and $210,000 in punitive damages (approximately a 27:1 ratio).[5] *Id.* at 1026. In affirming the award, the Eighth Circuit concluded "that the defendants' conduct was egregious and that it demonstrated a clear and disturbing disregard for [plaintiff]'s safety and her eco-

nomic interests" and that, while the award was generous, "it was far from 'grossly excessive.'" *Id.* at 1027.

Having compared the record in this case to the facts involved in *Grabinski*, we see little to distinguish the two cases other than that the facts in *Grabinski* do not mention any evidence that the rebuilt vehicle was unsafe to drive, potentially making the facts of the instant case more egregious than those in *Grabinski*.

The facts in the case at bar also bear a good deal of similarity to those in *Parrott v. Carr Chevrolet, Inc.*, 331 Or. 537, 17 P.3d 473 (2001), wherein the Oregon Supreme Court affirmed an award of $11,496 in compensatory damages and $1 million in punitive damages (an 87:1 ratio) where the defendant car dealership sold the plaintiff a Suburban that had been previously involved a serious accident and was missing several pieces of emissions control equipment. *Id.* at 476, 478. The Oregon Supreme Court held that the $1 million dollar award was constitutionally permissible where the plaintiff's experts had testified that, even without conducting a detailed inspection of the Suburban, a minimally trained dealership employee would have recognized several "red flags" indicating that the vehicle had been altered. *Id.* at 480. In addition, a public records check on the vehicle reflected that it had been severely damaged in California and had a

---

**4.** The underlying facts of the case were set forth in the Eighth Circuit's previous opinion: *Grabinski v. Blue Springs Ford Sales, Inc.*, 136 F.3d 565, 567–68 (8th Cir.1998).

**5.** The verdicts were entered against five different defendants. The jury awarded the plaintiff actual damages of $5,300 against the retailer and its three employees jointly and severally for concealing the wreck damage and $2,535 against all of the defendants jointly and severally for other concealed defects.

*Grabinski v. Blue Springs Ford Sales, Inc.*, 203 F.3d 1024, 1026 (8th Cir.2000). The jury awarded punitive damages of $100,000 against the retailer, $50,000 against the wholesaler, $30,000 against one employee, $20,000 against a second employee, and $10,000 against a third employee. *Id.* Thus, the individual ratios that were affirmed were 99:1, 55:1, 16:1, 11:1, and 5:1, respectively. *Id.*

"title brand". *Id.* at 478. The court noted:

> [t]here was evidence from which the jury could have found that defendant knew of the extensive defects of the Suburban and of its branded title and odometer discrepancy, and that it concealed those facts from plaintiff. There was evidence from which the jury could have concluded that defendant's treatment of plaintiff was not an isolated incident in that it had established business procedures that it could employ to cover any failure to disclose. There was evidence that defendant also used abusive tactics to cover its deceptions. Furthermore, from the evasive, inconsistent, and implausible explanations given by defendant's representatives as to defendant's business practices, the jury could infer that defendant had no intention of altering its practices in the future.

*Id.* at 487. The court noted that "[u]nlike in *Gore*, the tortious conduct ... did not involve undisclosed cosmetic damage to a new vehicle," and, instead, the defendant had "made material misrepresentations about the Suburban's condition that affected its value" and caused the defendant to be unable to obtain insurance coverage or proper registration to allow him to drive the vehicle. *Id.* at 488. The court further noted that the "defendant's failure to disclose that the Suburban previously had been damaged also implicated its overall safety and evinced an indifference not only to plaintiff's health and safety, but also to the health and safety of the general public that would share the road with a potentially unsafe vehicle." *Id.*

The court held that the "Defendant deliberately misrepresented or failed to disclose to plaintiff material information that implicated the value and safety of the Suburban. Defendant also demonstrated a willful disregard of the legislative protec-

tions for Oregon consumers and an unwillingness to modify its practices." *Id.* The court also noted:

> Because defendant's tortious conduct was a routine part of its business practice that it was unwilling to change, we also consider the potential injury that its misconduct may have caused to past, present, and future customers. Additionally, although the actual economic harm that plaintiff suffered in this proceeding was relatively small, the harm was the result of defendant's 'particularly egregious' acts.

*Id.* at 489.

In this case, given the relatively small amount of actual damages awarded, the egregious nature of Appellants' acts, Appellants' open refusal to alter their behavior, and the magnitude of the potential harm that could have been sustained had the structural problems with the truck not been discovered by Respondents' expert, the ratio of the punitive to actual damages does not, in and of itself, offend due process. *See id.; TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 459–60, 462, 113 S.Ct. 2711, 2721, 2722–23, 125 L.Ed.2d 366 (1993) (affirming a 526 to 1 ratio in a slander of title action, where the actual damages were relatively small ($19,000), because the misconduct was part of a large pattern of outrageous conduct and that the harm likely to result from defendant's misconduct was much larger); *Weaver*, 54 S.W.3d at 589 (upholding a 66:1 punitive damages to actual damages ratio in a case where a church elder grabbed a female reverend's breasts and further evidence was introduced indicating that further physical and verbal harassment had occurred); *Routh Wrecker Serv. Inc. v. Washington*, 335 Ark. 232, 980 S.W.2d 240, 241–42 (1998) (affirming a punitive damages award of $75,000 where only $1,000 had been awarded in actual damages

where a used car dealer had a customer arrested because he mistakenly thought the customer had taken a car from his lot without paying for it and then failed to notify the prosecuting attorney after finding the car present on his lot until the date of the probable cause hearing); *Kemp v. American Tel. & Tel., Co.*, 393 F.3d 1354, 1357–58, 1364, 1365 (11th Cir.2004) (remitting award of punitive damages to $250,000 where actual damages were $115.05, a 2,173:1 ratio, in a case where AT & T improperly collected gambling debts incurred in game played by Georgia citizens over the telephone because anything "less than $250,000 would not serve a meaningful deterrent to a corporation like AT & T").

▮ Finally, the third factor we must consider in assessing whether a punitive award is excessive is how the punitive award compares to the civil or criminal penalties that could be imposed for comparable misconduct.[6] *Gore*, 517 U.S. at 583, 116 S.Ct. at 1603.[7] In this vein, in addition to any potential fines or imprisonment that might be imposed on the defendants, we must consider the impact their actions could have on their business licensure. *See Id.* 517 U.S. at 583–84 & n. 40, 116 S.Ct. at 1603 & n. 40; *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672, 678 (7th Cir.2003).

Pursuant to § 301.562, a car dealership's use of fraud, deception, or misrepresentation in the sale of a vehicle constitutes grounds for discipline by the Administrative Hearing Commission which could result in the suspension or revocation of the dealership's license. While the record does not contain any evidence indicating

what the suspension or revocation of Appellants' dealership license would cost Appellants, such a sanction would certainly severely impact upon their business and may well be more costly to Appellants than a punitive award of $500,000. *See Mathias*, 347 F.3d at 678 (proclaiming the Court's firm belief that the defendant would prefer to pay the $186,000 in punitive damages awarded to each plaintiff rather than lose its license). Accordingly, the punitive damage award does not appear to be significantly out of line with the civil sanctions that could be imposed upon Appellants.

Having carefully considered the factors set forth in *Gore*, we are simply not left with the impression that the jury's award was grossly excessive given the relatively small amount of actual damages awarded, the egregious nature of Appellants' acts, Appellants' pattern of engaging in similar behavior, Appellants' open refusal to alter their behavior, and the magnitude of the potential harm that could have resulted. Point denied.

▮ In their second point, Appellants claim that the trial court erred in denying their motion *in limine* in which they sought to exclude from evidence any reference to a prior case, *Soper v. Payne Motor Co.*, that had been filed against Mr. Payne. Appellants argue that the previous case was too dissimilar and remote in time to have had any probative value to the case at issue.

In their third point, Appellants assert that the trial court erred in denying their motion *in limine* to exclude evidence related to another case, *Sloan v. Morse Chevro-*

---

6. While noting the inclusion of this as a factor in the *Gore* analysis, Appellants wholly fail to address this factor on appeal, apparently conceding that this factor does not weigh in their favor.

7. This factor "is accorded less weight in the reasonableness analysis than the first two guideposts." *Kemp v. American Tel. & Tel.*, 393 F.3d 1354, 1364 (11th Cir.2004).

**164**

*let,* wherein Mr. Payne sold a defective minivan to Mrs. Sloan while working at Morse Chevrolet. Appellants contend that the situation in that case was too dissimilar to the Krysa's claim to have any probative value and that it also should have been excluded because Mr. Payne wasn't a named defendant and had no judgment entered against him. These two points will be addressed together.

"Denial of a motion in limine is interlocutory and presents nothing for appellate review." *Ryan v. Maddox,* 112 S.W.3d 476, 479 (Mo.App. W.D.2003). " 'It is a timely objection at trial, when the evidence is offered, which preserves the matter for review, and not the rejection of a motion in limine.' " *Henderson,* 68 S.W.3d at 479 (quoting *Slankard v. Thomas,* 912 S.W.2d 619, 627 (Mo.App. S.D. 1995)). " 'After the denial of a motion in limine, a specific objection must be made at the time the evidence discussed in the motion in limine is introduced at trial' in order to preserve the issue for appeal." *Id.* (quoting *Bowls v. Scarborough,* 950 S.W.2d 691, 702 (Mo.App. W.D.1997)).

Appellants failed to offer any objection at trial to the evidence introduced related to the *Soper* or *Sloan* cases. In fact, on numerous occasions, counsel for Appellants specifically stated that he had "no objection" to the admission of evidence related to each of those two cases. "This response constituted a waiver of any claim of error regarding the admissibility of the evidence." [8] *McCormack,* 159 S.W.3d at 399. Accordingly, not only did Appellants fail to preserve their claims of error regarding to the admission of evidence related to the *Soper* and *Sloan* cases, they affirmatively waived any claim they might have had. Points denied.

The judgment is affirmed.

All concur.

---

8. Even had Appellants requested plain error review of their claim, plain error review is unavailable where counsel affirmatively states that he or she has no objection to the admission of the evidence. *McCormack v. Capital Elec. Const. Co.,* 159 S.W.3d 387, 399 (Mo. App. W.D.2004).